PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COVENANT MEDIA OF SOUTH
CAROLINA, LLC,
          *Plaintiff-Appellant,*

v.

THE CITY OF NORTH CHARLESTON,          No. 06-1894
          *Defendant-Appellee.*

SCENIC AMERICA,
          *Amicus Supporting Appellee.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(2:05-cv-01394-PMD)

Argued: March 12, 2007

Decided: July 6, 2007

Before WILLIAMS, Chief Judge, and TRAXLER and
SHEDD, Circuit Judges.

Affirmed by published opinion. Chief Judge Williams wrote the opinion, in which Judge Traxler and Judge Shedd joined.

## COUNSEL

**ARGUED:** Edward Adam Webb, THE WEBB LAW GROUP, L.L.C., Atlanta, Georgia, for Appellant. Derk B. K. Van Raalte, IV,

BRADY HAIR LAW OFFICES, North Charleston, South Carolina, for Appellee. **ON BRIEF:** Randal R. Morrison, SABINE & MORRISON, San Diego, California; Stephanie P. McDonald, SENN, MCDONALD & LEINBACH, L.L.C., Charleston, South Carolina; J. Brady Hair, BRADY HAIR LAW OFFICES, North Charleston, South Carolina, for Appellee. William D. Brinton, ROGERS TOWERS, P.A., Jacksonville, Florida, for Amicus Supporting Appellee.

---

## OPINION

WILLIAMS, Chief Judge:

Covenant Media of South Carolina, LLC ("Covenant"), a company in the business of erecting and operating billboards, appeals the district court's grant of summary judgment to the City of North Charleston ("North Charleston" or "City"), South Carolina on Covenant's claim under 42 U.S.C.A. § 1983 (West 2003) that North Charleston violated Covenant's First Amendment rights through its sign regulations. For the following reasons, we affirm.

I.

Although billboards are important communication tools that convey political, social, and, most commonly, commercial messages, they create unique issues apart from their communicative function because they are "large, immobile, and permanent structures." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 502 (1981). (internal quotation marks omitted). Billboards convey messages, but they do so through imposing structures dotting the landscape. These structures "create[ ] a unique set of problems for land-use planning and development." *Id.*

Because of their large, inescapable visual presence, billboards have been the target of national and state regulation. For example, in the Highway Beautification Act of 1965, 72 Stat. 1028, Congress declared "that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the

public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." 79 Stat. 1028, § 131(a).

South Carolina responded to the concerns caused by billboards by enacting the Highway Advertising Control Act (HACA), S.C. Code Ann. § 57-25-110 *et seq.* (West 2006). HACA, however, does not purport to provide exclusive regulation for billboards, and it contemplates that municipalities may enact stricter regulations of billboards. *See* S.C. Code Ann. § 57-25-220. This case concerns North Charleston's efforts, through its general sign regulations, to regulate billboards within its city limits and the effect those regulations had on Covenant.

The relevant facts are detailed later, but a brief preview now will help set the stage. In December 2004, Covenant submitted an application to construct a billboard in North Charleston. At the time, the City had in effect a zoning regulation (the "Sign Regulation") governing billboards as well as other signs. When months later the City had not provided Covenant a decision on the application, Covenant filed this lawsuit challenging the constitutionality of the Sign Regulation. Four months later, the City published its intention to amend the Sign Regulation.[1] Two days after that published notice, Covenant filed twenty-five additional applications. In the end, none of Covenant's applications were approved.

## A.   The Sign Regulation

Until October 13, 2005, North Charleston had in effect a Sign Regulation governing placement of billboards and other signs within the city limits. The Sign Regulation distinguished between off-premises signs and on-premises signs. Off-premises signs were defined as signs "identifying or advertising a business, person, or activity, or goods, products, services or facilities not located on the premises where the sign is installed or directing persons to a different location from

---

[1]Throughout this opinion, we use the term "Sign Regulation" to refer to the regulation in effect from before the time this case was commenced until October 13, 2005, when the City enacted amendments. "Revised Sign Regulation" refers to the amended sign regulation.

where the sign is installed." Sign Regulation, § 8-2(g). On-premises signs were defined as signs "identifying or advertising a business, person, or activity, or goods, products, services or facilities located on the premises where the sign is installed." Sign Regulation, § 8-2(h).

Under the Sign Regulation, "all off-premises signs [were] considered to be billboards." The regulation required that a permit be issued before a billboard could be constructed, and billboards were required to comply with certain requirements. Sign Regulation, §§ 7-2, 8-6(c). For example, billboards could not "be located outside of an approved billboard plaza," which was defined as parts of certain main thoroughfares, and could not "be located in a neighborhood which is primarily residential in character." Sign Regulation, § 8-6(c). There were also size and spacing requirements: No billboard could "have an area of greater than seven hundred seventy-two (772) square feet," and no billboard could be "be located any closer than one thousand (1,000) feet from any existing billboard." *Id.*

Applications to construct billboards were required to be filed with North Charleston's zoning administrator. Important for this appeal, the Sign Regulation did not require the zoning administrator to act on an application within a specified period of time.

### B.    Covenant's First Application

On December 1, 2004, Covenant submitted an application to construct a billboard at 2161 Ashley Phosphate Road (the "December 2004 Application"). At the North Charleston City Hall, Covenant submitted the December 2004 Application to an authorized City official, who provided Covenant an initialed Receiving Record acknowledging receipt of the application.

By late spring 2005, Covenant had received no word from North Charleston concerning the December 2004 Application. Covenant did not call, write a letter, or otherwise inquire into the status of the application. Instead, Covenant responded to the City's inaction by filing a civil action against North Charleston under 42 U.S.C.A. § 1983 alleging that North Charleston violated Covenant's First Amendment rights through enforcement of its Sign Regulation.

### C. The Revised Sign Regulation
### and Covenant's Subsequent Applications

In September 2005 — after Covenant had filed this lawsuit — North Charleston began acting on long-intended revisions to the City's sign regulations. On September 15, 2005, the City Council conducted the first reading of the Revised Sign Regulation that, among other things, capped the total number of billboards in the City at the current level and set a time limit for the City to act on a sign permit application. On September 28, 2005, the City published notice in Charleston's largest newspaper, *The Post and Courier*, that a public hearing would be held on October 13, 2005, during which the Revised Sign Regulation would be approved.

On September 30, two days *after* the published notice of the hearing for approval of revisions to the sign regulations, Covenant submitted twenty-five additional sign permit applications to the City of North Charleston (the "September 2005 Applications"). The September 2005 Applications were for permits to build billboards on several North Charleston streets, including multiple locations on Rivers Avenue and Ashley Phosphate Road.

On October 13, 2005, North Charleston's City Council enacted the Revised Sign Regulation. The City Council's stated purpose for the Revised Sign Regulation was to establish signage rules that "foster overall improvement to the aesthetic and visual appearance of the city, preserve and open up areas for beautification on property adjoining the public roadways, reduce visual clutter, enhance the City of North Charleston as an attractive place to live and work, reduce blighting influences, and improve traffic safety by reducing driver distractions." (J.A. at 118-19.)[2]

To accomplish this purpose, the Revised Sign Regulation prohibits a net increase in new billboards. The only new billboards that it allows are those billboards that are constructed to replace existing billboards pursuant to a relocation agreement with the City. Revised Sign Regulation, § 8-6(e). For those billboards that can be built, the

---

[2]Citations to "(J.A. at ___.)" refer to the contents of the Joint Appendix filed by the parties in this appeal.

Revised Sign Regulation incorporates the former Sign Regulation's size and spacing requirements. Thus, as before, new billboards cannot be larger than 772 square feet and must be at least 1000 feet from an existing billboard. Revised Sign Regulation, § 8-9(b).

The Revised Sign Regulation also includes a 45-day time limitation for the City to act on sign permits, a procedural provision that was missing from the old ordinance. If the City fails to act within the 45-day period, the permit is deemed denied. Revised Sign Regulation, § 8-6(e).

From the time Covenant submitted its December 2004 Application through the adoption of the Revised Sign Regulation, Covenant owned no operating billboards, had no contracts with sign manufacturers or installers, and had no advertising contracts. After North Charleston adopted the Revised Sign Regulation, Covenant purchased another advertising company, Adams Outdoor, thereby acquiring over 300 billboard structures in South Carolina.

### D.    The City's Response

On October 14, 2005 — the day after the City adopted the Revised Sign Regulation — North Charleston's zoning administrator notified Covenant by letter that its December 2004 Application could not be processed under the old Sign Regulation because the application failed to show property lines, dimensions, rights of way, and parking areas and because it did not include drawings and a certification from a registered South Carolina architect or engineer that the sign was safe and would withstand 100 mile-per-hour winds. All this information was required by the old Sign Regulation. *See* Sign Regulation, § 8-3(d). The City also warned Covenant that even if the application were complete it would likely be denied because the proposed sign "appears to be closer than 1000' to a previously established billboard." (J.A. at 144.)

Thereafter, the City's zoning administrator submitted an affidavit in this case stating that the December 2004 Application and September 2005 Applications were "incomplete and thus not capable of being formally processed" because they did not include information required by the Sign Regulation and Revised Sign Regulation. (J.A.

at 207-210.) With regard to the merits of the applications, the zoning administrator stated that the December 2004 Application also failed to satisfy the old and revised sign regulations' requirement that new billboards be located at least 1000 feet from an existing billboard. In fact, the billboard proposed in the December 2004 Application was no more than 726 feet from a preexisting billboard — a clear violation of the spacing requirement. The zoning administrator explained that the September 2005 Applications were unapprovable because the proposed signs were not replacement signs, as required by the Revised Sign Regulation.

## E. District Court Decision

Covenant filed a motion for partial summary judgment on its § 1983 claim, seeking a court order allowing it to construct the billboard requested in the December 2004 Application. North Charleston also filed a motion for summary judgment, seeking to have Covenant's case declared moot because the Revised Sign Regulation completely and permanently prohibits all new billboards. In addition, North Charleston asserted that the December 2004 Application could not be approved because it failed the Sign Regulation's requirement that a billboard be 1000 feet from an existing billboard.

In a decision on July 12, 2006, the district court concluded that Covenant's claims for injunctive relief, in which Covenant sought a court order enjoining the City from enforcing the old Sign Regulation, were moot in light of North Charleston's adoption of the Revised Sign Regulation. But the district court concluded that Covenant's claim for monetary damages did not become moot as a result of the City's replacement of the Sign Regulation with the Revised Sign Regulation.

North Charleston did not contest Covenant's allegation that the old Sign Regulation was unconstitutional, and the district court concluded that North Charleston's Sign Regulation "purported to regulate the posting of signs based on their content" because the City treated off-premises signs (billboards) differently than on-premises signs. (J.A. at 342.) The district court observed, however, that the December 2004 Application proposed a sign closer than 1000 feet to a preexisting billboard, thereby failing the Sign Regulation's content-neutral spac-

ing requirement. The court therefore determined that Covenant did not have standing to challenge the Sign Regulation or to assert a claim of damages on the basis of its unsuccessful December 2004 Application "[b]ecause the application would have been denied even absent the unconstitutional provisions of the sign ordinance." (J.A. at 350.) In this respect, the district court reasoned that "if the applications were deficient under the prior ordinance's content-neutral requirements, then Covenant suffered no redressable injury by the City's denial of the applications and therefore lacks standing to challenge the unconstitutional provisions of the prior ordinance." (J.A. at 347.)

The district court further concluded that Covenant lacked standing to challenge the Sign Ordinance with respect to the denial of the September 2005 Applications because those applications are barred by the Revised Sign Regulation in accordance with South Carolina's pending ordinance doctrine.

Having determined that Covenant's claims for injunctive relief were moot and that Covenant lacked standing to assert claims for damages, the district court granted North Charleston's motion for summary judgment.

Covenant timely appealed. We have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

We review de novo the district court's grant of summary judgment to North Charleston on Covenant's § 1983 claim, and we construe the facts in the light most favorable to Covenant, the non-moving party. *See Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). The district court's conclusion that Covenant lacked standing — and that the court therefore lacked Article III jurisdiction — is a legal conclusion that we review de novo. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Laber*, 438 F.3d at 415 (quoting Fed. R. Civ. P. 56(c)).

A.

We begin, as we must, with standing and the district court's determination that Covenant lacked Article III standing to assert the unconstitutionality of the Sign Regulation. As the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, a plaintiff must show (1) an "injury in fact," meaning an injury that is "concrete and particularized" and "actual or imminent;" (2) a "causal connection between the injury and the conduct complained of," meaning that the injury is "fairly traceable" to the defendant's actions; and (3) a likelihood that the injury "will be redressed by a favorable decision." *Id.* at 560-61 (internal quotation marks omitted).

Covenant contends that the district court erred in determining that Covenant lacked standing because it "improperly concluded that Covenant's only injury was the ultimate denial of its initial application." (Appellant's Br. at 12.) In that respect, the district court "completely overlooked the injury suffered by Covenant as a result of the City's failure to process Covenant's initial sign application in a timely fashion." (Appellant's Br. at 12.) North Charleston counters by arguing that Covenant does not have standing to assert a claim for the untimely processing of its December 2004 Application because that application would have been denied — regardless of how long it took — for failing to comply with the Sign Regulation's spacing requirement. Thus, the City's argument goes, Covenant's "injury" of not receiving an approved application stems from the constitutional spacing requirement, not from the City's failure to process the application.

We agree with Covenant that the injury of not having an application processed timely is distinct from the injury of ultimate denial of that application. Covenant contends that the Sign Regulation, applied by the City, was unconstitutional on its face because it failed to require a decision on a sign permit within a specific time period, in contravention of procedural safeguards mandated in *Freedman v. Maryland*, 380 U.S. 51, 58-59 (1965), and *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990).[3] If Covenant is right that the *Freed-*

---

[3]The *Freedman* procedural safeguards, which are explained more fully later, require any permitting scheme that operates as a prior restraint on speech to set a time period for a decision on a permit application.

*man* procedural safeguards were required in the Sign Regulation, it has suffered an injury by the City's application of an unconstitutional ordinance that is redressable at least by nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978). Morever, just because a decisionmaker has a valid, constitutional basis for denying an application for a permit does not allow him to refuse to act on the application. The City cannot indefinitely delay consideration of an application simply because it knows that it has an ace in the hole — that the application would ultimately fail a valid requirement.

Whether *Freedman* in fact applies here is a matter that we must resolve on the merits, "[b]ut we must not confuse standing with the merits." *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1256 (10th Cir. 2004) (concluding that an organization has standing to raise a First Amendment claim based on a permitting scheme's failure to comply with *Freedman* even if it is determined that on the merits *Freedman* does not apply). A plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case. *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends upon the merits of the plaintiff's contention that particular conduct is illegal . . . ."). Rather, standing "depends . . . on whether the plaintiff is the proper party to bring the suit." *White Tail Park*, 413 F.3d at 460 (internal quotation marks, alteration, and citation omitted). Otherwise, if a plaintiff's standing depended upon whether he succeeds on the merits, "then every unsuccessful plaintiff will have lacked standing in the first place." *Id.* at 461 (internal quotation marks omitted). Because Covenant alleges a personal injury — untimely consideration of its December 2004 Application — that was caused by North Charleston's application of the allegedly unconstitutional Sign Regulation and that is redressable by nominal damages, we conclude that the district court erred in determining that Covenant lacked standing.[4] *See Allen v. Wright*, 468 U.S. 737, 751 (1984).

---

[4]The constitution also requires that there be a live "case or controversy," i.e., a dispute that has not become moot. *See Am. Legion Post 7 v. City of Durham*, 239 F.3d 601, 605 (4th Cir 2001). In some cases, the repeal of a statute or regulation renders moot a challenge to that law. *Id.* Here, however, we agree with the district court's determination that Covenant's suit was not rendered moot by the City's replacement of the Sign

B.

That Covenant has standing to challenge the timeliness of the City's decision on the December 2004 application does not provide it a passport to explore the constitutionality of every provision of the Sign Regulation.[5] Although there is broad "latitude given facial challenges in the First Amendment context," *Gonzales v. Carhart*, 127 S. Ct. 1610, 1639 (2007), a plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions. *FW/PBS*, 493 U.S. at 230; *see CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) ("We and our sister circuits have followed *FW/PBS* to require a plaintiff to establish injury in fact as to each provision [of an ordinance]."), and *id.* (collecting cases).

In this case, Covenant has standing only to challenge the constitu-

---

Regulation with the Revised Sign Regulation. In addition to injunctive relief, Covenant sought compensatory and nominal damages from the City's enforcement of the allegedly unconstitutional former Sign Regulation. Covenant's suit is not moot because if Covenant is correct on the merits, it is entitled to at least nominal damages. *See Henson v. Honor Comm. of the Univ. of Va.*, 719 F.2d 69, 72 n.5 (4th Cir. 1983) (noting that the dropping of disciplinary charges did not render a due process claim moot because the plaintiff was seeking nominal damages); *KH Outdoor, LLC v. Clay County, Fla.*, 482 F.3d 1299, 1303 (11th Cir. 2007) ("[B]ecause KH Outdoor requested damages, the changes made to the ordinance do not moot KH Outdoor's challenge to the Old Sign Ordinance."); *Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 803 (8th Cir. 2006) (holding that a city's revisions of its sign ordinance did not moot a sign company's claim for damages because the company "might be entitled to nominal damages if it could show that it was subjected to unconstitutional procedures").

[5]The district court concluded that Covenant did not have standing to challenge the Sign Regulation under the First Amendment overbreadth doctrine, established in *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 512 (4th Cir. 2002) ("The overbreadth doctrine constitutes 'a departure from the traditional rules of standing.'" (quoting *Broadrick*, 413 U.S. at 613)). Covenant does not challenge this conclusion. (*See* Reply Br. at 1.)

tionality of the Sign Regulation insofar as it failed to require that decisions on applications be made within a specified period of time, in violation of *Freedman*. With respect to the ultimate denial of Covenant's December 2004 Application, the application was unapprovable because the proposed billboard was not at least 1000 feet from an existing billboard — a requirement not challenged by Covenant. Because Covenant's application violated the spacing requirement, it could not have been approved regardless of whether other substantive provisions of the Sign Regulation are held to be unconstitutional. Covenant, therefore, could not have suffered any substantive constitutional injury due to other provisions of the Sign Regulation that may have been unconstitutional. For this reason, Covenant does not have standing to challenge other substantive provisions of the Sign Regulation that could have served as the basis for denying the December 2004 Application. *See Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (holding that an outdoor advertising company could not establish redressability, and therefore standing, because "a favorable decision for Advantage even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its proposed signs, for these would still violate other unchallenged provisions of the sign code like the restrictions on size, height, location, and setback."). In sum, Covenant has standing to challenge the Sign Regulation's *process* for considering the December 2004 Application, but lacks standing to challenge the potential bases for the ultimate denial of that application.[6] *See CAMP*, 451 F.3d at 1273 (holding that an organization can challenge only those provisions of an ordinance that are related to its activities).

---

[6]Since Hurricane Hugo ravaged the Charleston area in 1989, North Charleston has had in place, with brief interruptions, a moratorium on billboards. Covenant argues that this moratorium was unconstitutional. We do not reach this question because North Charleston has never claimed to have denied Covenant's applications or delayed consideration of them because of the moratorium. Instead, North Charleston claimed that the applications were properly denied by applying the regulations. Because the moratorium was never applied to Covenant's applications, Covenant has not been injured by the moratorium and therefore has no standing to challenge it.

III.

Although we conclude that the district court erred in holding that Covenant lacked standing to challenge the constitutionality of the Sign Regulation, we may nonetheless affirm on alternative grounds the district court's grant of summary judgment to North Charleston. *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("[T]he decision of a lower court . . . must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason. . . . It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground . . . ." (internal quotation marks omitted)). We conclude that the district court reached the correct result, albeit for different reasons.

On the merits, Covenant argues that the Sign Regulation was an unconstitutional prior restraint on speech — both facially and as-applied — because it did not require the City to make a decision on the December 2004 Application within a specified period of time (a *Freedman* procedural safeguard), thereby allowing the City to delay a decision for over 300 days. We address these arguments in the following sequence. First, we explain that *Freedman* does not apply to all prior restraints, only those that are content-based. Second, we conclude that the Sign Regulation was content-neutral and that *Freedman*'s procedural safeguards were therefore not required. Finally, we conclude that the City did not apply the Sign Regulation in an unconstitutional manner.

A.

Covenant contends that the Sign Regulation was an unconstitutional prior restraint on speech because the Sign Regulation did not impose time limits on North Charleston's decision-making process. In *Freedman*, the Supreme Court set forth three procedural safeguards for a speech licensing scheme: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden

of proof once in court." *FW/PBS*, 493 U.S. at 227 (citing *Freedman*, 380 U.S. at 58-60).

"A prior restraint on speech that imposes no time limitations on the decision-making process plainly fails to satisfy the first requirement set forth in *Freedman*." *11126 Baltimore Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988, 997 (4th Cir. 1995) (en banc) (citing *FW/PBS*, 493 U.S. at 229). This is because "[a] scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *FW/PBS*, 493 U.S. at 227.

Nevertheless, not all prior restraint permitting schemes must provide *Freedman*'s procedural safeguards. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2002). In *Thomas*, the Court counseled that the critical distinction for determining whether *Freedman*'s procedural requirements apply is whether the permitting scheme is content based. *Thomas* addressed Chicago's regulations governing rallies in city parks. Pursuant to the scheme, a group applied on several occasions for permits to hold rallies advocating the legalization of marijuana. *Id.* at 319-20. Some of the group's applications were granted and some were denied, and the groups sued the Chicago Park District alleging that the permitting ordinance was unconstitutional on its face because it failed to meet *Freedman*'s procedural requirements. *Id.* at 320.

The Supreme Court rejected the facial challenge that the permitting scheme was unconstitutional for failing to include *Freedman*'s requirements. The Court explained that "*Freedman* is inapposite because the licensing scheme at issue . . . is not subject matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." *Id.* at 322. "A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* [i.e., diametrically] from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like." *Id.* at 322-23 (internal quotation marks omitted).

The Court distinguished the Chicago Park District's licensing scheme, which was a content-neutral permit scheme, from that in *FW/PBS*, which "involved a licensing scheme that 'target[ed] busi-

nesses purveying sexually explicit speech.'" *Id.* at 323 n.2 (quoting *FW/PBS*, 493 U.S. at 224). Likewise, our decision in *11126 Baltimore Blvd.* dealt with an ordinance that "prohibit[ed] adult bookstores," defining such bookstores by the subject matter of the content they sold. 58 F.3d at 992 & n.1.[7]

Thus, to determine whether *Freedman* or *Thomas* governs resolution of this case, and accordingly whether the absence of time limits on decisionmaking rendered the Sign Regulation unconstitutional, we must determine whether the Sign Regulation was content based or content neutral. *See Thomas*, 534 U.S. at 322; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) (stating that the constitutional scrutiny applied to a regulation depends upon whether it is content based or content neutral).

### B.

As the district court observed, under the Sign Regulation "[a] billboard or other off-premises sign 'identifying or advertising a business, person, or activity, or goods, products, services or facilities not located on the premises where the sign is installed or directing persons to a different location from where the sign is installed' w[as] considered a 'sign requiring a permit.'" (J.A. at 341-42.) The Sign Regulation's distinguishment between off-premises and on-premises signs led the district court to conclude that North Charleston "purported to regulate the posting of signs based on their content." (J.A. at 342.)

We disagree with the district court's conclusion that the Sign Regulation's differing treatment of signs based on their location constitutes

---

[7]Relying on Supreme Court precedent, we stated in *11126 Baltimore Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988 (4th Cir. 1995) (en banc), that "otherwise valid content-neutral time, place, and manner restrictions that require governmental permission prior to engaging in protected speech must be analyzed as prior restraints and are unconstitutional if they do not limit the discretion of the decisionmaker and provide for the *Freedman* procedural safeguards." *Id.* at 995. As explained in the text, this statement is no longer valid after *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2002).

a content-based regulation of the signs. "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). As the Court explained, "[g]overnment regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech." *Id.* (internal quotation marks omitted).

Expanding on *Ward*'s formulation for determining the content neutrality of a regulation, the Supreme Court has explained that a regulation is not a content-based regulation of speech if (1) the regulation "is not a 'regulation of speech,'" but rather "a regulation of the places where some speech may occur;" (2) the regulation "was not adopted 'because of disagreement with the message [the speech] conveys;'" or (3) the government's interests in the regulation "are unrelated to the content of the [affected] speech." *Hill v. Colorado*, 530 U.S. 703, 719-20 (2000); *see Satellite Broad. and Commc'ns Assoc. v. FCC*, 275 F.3d 337, 353-54 (4th Cir. 2001) ("First, we must examine the plain terms of the regulation to see whether, on its face, the regulation confers benefits or imposes burdens based upon the content of the speech it regulates. If it does not, we then ask whether the regulation's manifest purpose is to regulate speech because of the message it conveys." (internal citations and quotation marks omitted)).

Examined in light of these criteria, it is clear that North Charleston's Sign Ordinance was not a content-based regulation. North Charleston was not concerned with the message that a sign (such as a billboard) conveyed but instead with where particular signs were located. For example, the Sign Regulation confined billboards to particular "billboard plazas" within the city. The regulation did not, however, allow billboards displaying commercial messages while prohibiting those displaying noncommercial messages.[8]  *Cf.*

---

[8]The Sign Regulation draws the location distinction as follows:

> (g) Off-premises sign: This is a sign identifying or advertising a business, person, or activity, or goods, products, services or facilities not located on the premises where the sign is installed or directing a person to a different location from where the sign is installed.

*Metromedia*, 453 U.S. at 512-13 (plurality opinion) (holding unconstitutional a city ordinance that generally banned signs carrying noncommercial advertising). A city can regulate the location of a particular type of signs, as long as the type of signs are not distinguished by the messages they convey.[9] *Id.* at 512. Similarly, the Sign

---

(h) On-premises sign: This is a sign identifying or advertising a business, person, or activity, or goods, products services or facilities located on the premises where the sign is installed.

Sign Regulation, § 8-2.

[9]The sign regulation in this case differs in important respects from the ordinance that the Court declared unconstitutional in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512-13 (1981). In *Metromedia*, San Diego's ordinance generally prohibited signs, but allowed on-site commercial signs and noncommercial signs falling within twelve categories. *Id.* at 494. On-site signs were defined as signs "designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising *goods* manufactured or produced or *services* rendered on the premises upon which such signs are placed." *Id.* (emphases added) (internal quotation marks omitted). Thus, San Diego's ordinance distinguished between commercial advertising — signs advertising goods or services — and signs conveying noncommercial messages. By contrast, North Charleston's Sign Regulation's off-premises/on-premises distinction does not depend on whether the sign contains commercial or noncommercial advertising. *See Major Media of the Se., Inc. v. City of Raleigh*, 792 F.2d 1269, 1272 (4th Cir. 1986) (holding that a sign ordinance does not run afoul of the First Amendment if it does not treat commercial speech more favorably than noncommercial speech).

The twelve categories exempted from San Diego's prohibition included "government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision directional signs; and temporary political campaign signs." *Metromedia*, 453 U.S. at 494-95 (internal quotation marks and alteration omitted). In this case, although North Charleston's Sign Regulation, like San Diego's, drew distinctions, e.g., for signs depicting time and temperature or commemorative signs, *see* Sign Regulation § 8-2(a) and (f), the Sign Regulation generally allowed all signs regardless of message, applying only time, place, and manner restrictions. *See* Sign Regulation, § 8-5.

Ordinance was adopted to regulate land use, not to stymie any particular message. And North Charleston's interests in regulating signs were completely unrelated to the messages displayed: They were to "eliminate confusing, distracting and unsafe signs, assure the efficient transfer of information; and enhance the visual environment of the City of North Charleston." (J.A. at 57-58.) These legitimate interests in regulating signs existed wholly apart from any particular message conveyed by a sign.

To be sure, the Sign Regulation defined and distinguished between different types of signs. *See, e.g.*, Sign Regulation § 8-2 (defining various types of signs including "directional or instructional signs," "memorial signs," and "public signs"). And we recognize that distinguishing between different types of signs and where those signs may be located may also in effect distinguish where certain content may be displayed. But "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. The Sign Regulation did not regulate the location of different types of signs based on "the ideas or views expressed." *Turner*, 512 U.S. at 643; *cf. Boos v. Barry*, 485 U.S. 312, 318-19 (1988) (holding that an ordinance that prohibits, within 500 feet of embassies, signs "tending to bring a foreign government into . . . disrepute" is content based); *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (identifying as content based an ordinance that prohibited picketing except for "[p]eaceful picketing on the subject of a school's labor-management dispute").

To the extent that the Sign Regulation required looking generally at what type of message a sign carries to determine where it can be located, this "kind of cursory examination" did not make the regulation content based. *Hill*, 530 U.S. at 721 ("We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct."). For a regulation with a clear content-neutral purpose to be content based, there must be a more searching inquiry into the content. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993) (concluding that a city ordinance banning newsracks except for those containing newspapers was content based because "whether any particular newsrack falls within the ban is

determined by the content of the publication resting inside that newsrack" and the ordinance "limited (to zero) the number of newsracks *distributing commercial publications*"). The Sign Regulation was content neutral despite any content-differentiating effect. *See* Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 Wm. & Mary L. Rev. 189, 218 (1983) ("[M]ost content-neutral restrictions have at least some de facto content-differential effects.").

*Turner* provides an analogous situation to the regulation at issue here. In *Turner*, the Court addressed the constitutionality of the "must-carry" provisions of the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-385, 106 Stat. 1460. 512 U.S. at 630. The must-carry provisions required cable operators to carry, according to a statutory formula, a certain number of the broadcast signals of "local commercial television stations" and "noncommercial education television stations." *Id.* at 631-32. Although the cable operators challenged the must-carry provisions as being content based because they favored certain speakers, the Court rejected this argument, concluding that the must-carry provisions were not content based because the "overriding congressional purpose" for the provisions was "unrelated to the content of the expression disseminated by cable and broadcast speakers." *Id.* at 647.

Likewise, North Charleston's Sign Regulation regulated the placement of signs unrelated to the messages on those signs. Instead, the City's purpose for the Sign Regulation was to address problems caused by signs wholly apart from any message conveyed. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) ("[S]igns take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation."). Thus, because North Charleston's Sign Regulation "d[id] not facially distinguish between . . . messages based on content and because there is no evidence of a content-based purpose," we conclude that the City's Sign Regulation was a content-neutral regulation.[10] *See Am.*

---

[10]That North Charleston's Sign Regulation was content neutral does not mean that the regulation was constitutional. Content-neutral regulations can be unconstitutional because they burden more speech than is necessary to further the government's legitimate interest. *See Turner*

*Legion Post 7 v. City of Durham*, 239 F.3d 601, 605 (4th Cir. 2001). Because the Sign Regulation was content neutral, it did not need time limitations on decisionmaking to be constitutional. *See Thomas*, 534 U.S. at 322. Accordingly, Covenant's facial challenge fails.

C.

Covenant also raises a challenge to the manner in which the City applied the Sign Regulation, contending that the City unconstitutionally "delay[ed] . . . over 300 days in processing the [December 2004] [A]pplication." (Appellant's Br. at 26-27.) Although content-neutral time, place, and manner regulations need not incorporate the *Freedman* procedural requirements, a decisionmaker cannot use the absence of such requirements to stifle free expression. *Thomas*, 534 U.S. at 323 (noting that "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression"); *see id.* at 325 ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements."). We must therefore determine whether North Charleston applied the absence of time limitations in its Sign Regulation in such a manner to stifle Covenant's First Amendment rights.

North Charleston does not dispute that it received Covenant's December 2004 Application. Instead, North Charleston asserts through a declaration from its city attorney that the December 2004 Application was "lost or misplaced." (J.A. at 203.) Prior to filing the lawsuit, Covenant never contacted the City to inquire about the status

---

*Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994); *City of Ladue v. Gilleo*, 512 U.S. 43, 53, 58 (1994).

In this case, North Charleston did not defend the constitutionality of the Sign Regulation, and the district court concluded that parts of the regulation "were overly-broad and gave the City impermissibly wide discretion to deny or grant billboard permits." (J.A. at 342.) We therefore leave undisturbed the district court's conclusion that the Sign Regulation — now since amended — was unconstitutionally overbroad.

of its application. After Covenant filed this lawsuit, North Charleston requested a copy of the December 2004 Application, but Covenant did not provide the City with a copy of the application until September 21, 2005. Once the City received the copy, it acted on the application approximately three weeks later, notifying Covenant on October 14, 2005, that the application was unapprovable because it violated the 1000 foot spacing requirement.

Although Covenant offers several reasons why North Charleston failed to act on the December 2004 Application until three weeks after receiving the copy, Covenant has not properly refuted the City's sworn statement that it failed to act on the application due to mere negligent handling of the application. *See* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Thus, in evaluating the grant of summary judgment to North Charleston on Covenant's First Amendment claim, we accept as a fact that the City's failure to act was negligent, not willful.

We turn now to the critical question in Covenant's as-applied challenge: Were Covenant's First Amendment rights violated by North Charleston's negligent handling of the December 2004 Application? We conclude that Covenant's rights were not violated.

Covenant brought this § 1983 action against North Charleston only; it did not sue any City official responsible for acting on the December 2004 Application. When a § 1983 claim is asserted against a municipality, two issues must be determined: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). Typically, determination of municipal liability under § 1983 centers on the second issue. *Id.*; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that a municipality is not liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort"). In this case, however, addressing the second issue is unneces-

sary because Covenant's harm was not caused by a constitutional violation.

"[I]n any given § 1983 suit, the plaintiff must . . . prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." *Daniels v. Williams*, 474 U.S. 327, 330 (1986). We have interpreted *Daniels* to mean that "allegations of a defendant's negligence do not state constitutional claims against such a defendant." *Gen. Elec. Co. v. United States*, 813 F.2d 1273, 1278 (4th Cir. 1987), *overruled on other grounds by Westfall v. Erwin*, 484 U.S. 292 (1988), *superseded by statute*, Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563. We have also held that, in a § 1983 claim, negligence on the part of a government official is not enough to show a violation of certain First Amendment rights. *See Pink v. Lester*, 52 F.3d 73, 76 (4th Cir. 1995) (holding that negligent conduct in misrouting a form does not violate the First Amendment's right to petition); *Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006) (holding "that negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause"). Thus, because negligent conduct is not enough to support a First Amendment claim against government officials, the absence of anything but negligence proves fatal to Covenant's as-applied challenge under § 1983.

If Covenant had called, written, or emailed the City to inquire about the status of the December 2004 Application and the City still refused to respond, such refusal may have established that the City intentionally refused to act on the application or was deliberately indifferent to the consequence of having a Sign Regulation that lacked procedural safeguards. Instead, Covenant is attempting to make a constitutional claim against the City for negligent handling of the December 2004 Application.

The City and its employees may have failed to take reasonable care in ensuring that Covenant's December 2004 Application was not lost, but such negligence does not amount to an intent to violate Covenant's First Amendment rights. To hold that negligent handling of the application amounts to a constitutional violation by the City would only trivialize the fundamental rights the First Amendment was meant

to protect. We therefore conclude that Covenant's as-applied challenge to the Sign Regulation fails.

IV.

As noted previously, North Charleston did not defend at summary judgment the constitutionality in toto of the Sign Regulation, but the City also did not identify any particular parts of the Sign Regulation that it conceded were unconstitutional. Instead, the City asserted that because the 1000 foot separation requirement was fatal to Covenant's December 2004 Application, the remainder of the Sign Regulation was irrelevant. Similarly, although the district court concluded that parts of the Sign Regulation were "overly-broad" and gave "impermissibly wide discretion," (J.A. at 342), the court did not specify which parts were unconstitutional, concluding instead that the December 2004 Application "would have been denied even absent the unconstitutional provisions of the sign ordinance." (J.A. at 350.)

Covenant contends that the district court erred in this approach because

> [r]ather than identifying the provisions of the Sign [Ordinance] that the City conceded were unconstitutional and then determining whether those parts were so connected as to establish that the City would not have passed the residue independently of that which is void, the District Court simply plucked the separation requirements out of the City's admittedly unconstitutional sign code and declared them severable from the remainder.

(Appellant's Br. at 24-25.) Covenant argues that because, in its view, the Sign Regulation was an unconstitutional prior restraint on speech because its permitting procedure did not have a time limitation for the City to process an application, the district court should have conducted a severance analysis to determine whether the unconstitutional provisions were severable from the remainder of the Sign Regulation. *See Knotts v. S.C. Dep't of Natural Res.*, 558 S.E.2d 511, 515 (S.C. 2002) (concluding that the touchstone for severability under South Carolina law is whether the unconstitutional part of a statute is so intertwined and interdependent with the remainder of the statute to

indicate that the legislature intended for the statute to remain as a whole).

We do not reach Covenant's severance argument for the simple reason that the Sign Regulation, which did not violate Covenant's First Amendment rights, was replaced by the Revised Sign Regulation prior to the district court's decision. Severance is a tool for preserving a current statute, *see United States v. Booker*, 543 U.S. 220, 245 (2005) (severing the unconstitutional provision of the federal sentencing statute that made the Sentencing Guidelines mandatory in order to preserve the remainder of the federal sentencing scheme), and it flows from the principle that invalidating a whole statute may nullify more of the work of the people's elected representatives than is constitutionally necessary, *see Ayotte v. Planned Parenthood of Northern New England*, 126 S. Ct. 961, 967-68 (2006). But when, as here, the legislative body has repealed a law, there is nothing to preserve, and a severance analysis is inapplicable.

V.

The remaining question before us is whether the district court correctly determined that the September 2005 Applications were properly denied under South Carolina's pending ordinance doctrine. Under South Carolina's pending ordinance doctrine, a city may properly refuse a permit for a land use "when such use is repugnant to a pending and later enacted zoning ordinance." *Sherman v. Reavis*, 257 S.E.2d 735, 737 (S.C. 1979); *see Scott v. Greenville County*, 716 F.2d 1409, 1418 (4th Cir. 1983) (looking to state law to determine whether an applicant held a cognizable interest in a zoning permit). "An ordinance is legally pending when the governing body has resolved to consider a particular scheme of rezoning and has advertised to the public its intention to hold public hearings on the rezoning." *Id.*

North Charleston's Revised Sign Regulation was legally pending when Covenant submitted the September 30 Applications. Two weeks earlier, the North Charleston City Council held the first reading of the Revised Sign Regulation, as reflected in an September 16, 2005, article in *The Post and Courier*, entitled "N. Charleston OKs billboard limits." (J.A. at 340.) On September 28, 2005, two days before Covenant submitted its September 30 Applications, the City published

notice in *The Post and Courier* that it would hold a public hearing on October 13, 2005, to approve the Revised Sign Regulation. Because the Revised Sign Regulation was, under South Carolina law, legally pending when Covenant submitted the September 30 Applications, it applied to those applications.[11] Those applications were prohibited under the Revised Sign Regulation because they were for new billboards, not billboards replacing existing billboards.

Finally, Covenant contends that the district court should have applied South Carolina's "time of application" rule rather than the pending ordinance doctrine. In *Pure Oil Div. v. City of Columbia*, 173 S.E.2d 140 (S.C. 1970), the South Carolina Supreme Court stated that where there is "good faith reliance by the owner on the right to use his property as permitted under the Zoning Ordinance in force at the time of the application for a permit," a subsequently enacted ordinance cannot deprive the owner of a use that was permitted under the then existing ordinance. *Id.* at 143. But for the time of application rule to apply, there must be good faith *reliance*. Covenant has not shown reliance on the old Sign Regulation. At the time Covenant submitted its September 2005 Applications, Covenant had no contracts for advertisements on the proposed billboards, no contracts with sign manufacturers, and no contracts with billboard installers. In fact, Covenant owned no operating billboards. Other than the hassle of preparing the ultimately unsuccessful applications,[12] the only actions Covenant took with respect to the September 2005 Applications that indicate any reliance were securing leases for the locations of the pro-

---

[11]We are unpersuaded by Covenant's argument that the pending ordinance doctrine should not apply because North Charleston never informed Covenant about the potential revisions. Although Covenant contends that the City told Covenant on September 23 to submit the September 2005 Applications without informing it of the pending revisions to the Sign Regulation and that this constitutes unjust conduct, Covenant has not pointed to any authority that would entitle it to notice before the public-at-large. The notice published on September 28 was sufficient to inform Covenant of potential revisions to the Sign Regulation.

[12]The hassle of preparing applications is surely not enough to demonstrate reliance; otherwise, the pending ordinance doctrine would never apply because every applicant has gone through the hassle of preparing a permit application.

posed billboards, but those leases did not require payments until there was an operating billboard. Covenant therefore has not demonstrated the type of reliance necessary to trigger the time-of-application rule. *Compare Sherman*, 257 S.E.2d at 737 (declining to apply the time-of-application rule because the permit applicant "ha[d] presented little, if any, proof of expenditures or incurrence of obligations in good faith reliance upon their proposed use"); *with Scott*, 716 F.2d at 1418 n.10 (concluding that the time-of-application rule applied because the permit applicant had "substantial expenditures in preparation for obtaining the permit" and had informal approval from government officials). Because there is no indication that Covenant relied on the old Sign Regulation, we conclude that the time-of-application rule does not apply.

## VI.

Contrary to the district court's decision, Covenant does have standing to challenge North Charleston's Sign Regulation, but Covenant's standing extends only to challenging the Sign Regulation's lack of time limitations on the City's decision to grant or deny an application. Nevertheless, because the Sign Regulation is content neutral, its failure to include time limitations does not render it unconstitutional. Neither did the City apply it unconstitutionally. Therefore, we affirm the district court's grant of summary judgment to North Charleston.

*AFFIRMED*