06-0607-cr
U.S.A. v. Cullen

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued December 5, 2006          Decided August 23, 2007)

Docket No. 06-0607-cr

_____

United States of America,

Appellee,

v.

Thomas Cullen, aka Thomas J.V. Cullen,

Defendant-Appellant.

_____

Before:
CARDAMONE, STRAUB, Circuit Judges,
and KOELTL*, District Judge.

_____

Defendant Thomas Cullen appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (McMahon, J.) on February 2, 2006, following a jury trial. Cullen was convicted of knowingly importing exotic birds into the United States in violation of the Wild Bird Conservation Act and of filing false applications relating to the importation with the United States Fish and Wildlife Service.

Affirmed.

_____

_____

* Hon. John G. Koeltl, United States District Court for the Southern District of New York, sitting by designation.

_____

PETER R. GINSBERG, Law Office of Peter R. Ginsberg, P.C., New York, New York, for Defendant-Appellant.

JESSE M. FURMAN, Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney, Stephen J. Ritchin, John M. Hillebrecht, Assistant United States Attorneys, Southern District of New York, New York, New York, of counsel), for Appellee.

_____

CARDAMONE, Circuit Judge:

We have before us a case that is unusual in several respects. In the first place, defendant was prosecuted, convicted and sentenced under the Wild Bird Conservation Act of 1992 (Wild Bird Act or Act), 16 U.S.C. § 4901 et seq., a federal statute that includes civil and criminal penalties. There have been very few, if any, previous prosecutions for violations of the Act's criminal penalties. Second, the defendant Thomas Cullen (defendant or appellant), an enigmatic and colorful figure, whose home is in Goshen, New York, is an internationally known professional falconer. He was hired at one time by the City of New York to bring bald eagles back to Inwood Hill Park in Manhattan. Yet, defendant also has a history of questionable activity involving exotic birds. Third, defendant was charged with illegally importing Black Sparrowhawks. Judicial opinions often characterize an odd provision of the law or an ingenious argument of counsel as a "rare bird" (rara avis). But in this case we have before us as the subject matter literally a rara avis in terris or a rare bird on the earth.

The rare bird which is the subject of this litigation is the Black Sparrowhawk. The Black Sparrowhawk is an African bird that for the most part lives in the southeastern corner of the African continent. Its length ranges from 18 to 23 inches; it has a black head and black upperparts, white underparts, yellow legs, and a silver-grey tail. The Black Sparrowhawk eats mainly other birds (mostly doves), although it has been known to devour on

2

occasion small mammals and snakes.  It is usually silent and unobtrusive except when it is breeding.  For the most part, this bird stays inside the cover of trees, only soaring sometimes in the sky.  See Gordon Lindsay Maclean, Roberts' Birds of Southern Africa 138 (6th ed. 1993).

Thomas Cullen appeals from a judgment of conviction entered February 2, 2006 in the United States District Court for the Southern District of New York (McMahon, J.) following a jury trial.  Defendant was convicted of knowingly importing exotic birds into the United States in violation of the Wild Bird Act and of making false statements relating to such importation with the United States Fish and Wildlife Service (Wildlife Service) in violation of 18 U.S.C. §§ 1001 and 1002.  Cullen challenges his conviction on the grounds that:  (1) the Wild Bird Act does not apply to captive-bred birds; (2) the Act is unconstitutionally vague because it does not define the term personal pet; and (3) the jury instruction given by the trial court was incorrect. Because those challenges are all without merit, we affirm.

BACKGROUND

A.  Statutory and Regulatory Background

A total of 21 nations including the United States in 1973 signed the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 (CITES or Convention).  The Convention's purpose is to regulate the trade of endangered plants and animals.  It contains three appendices that list the species subject to its

3

regulations. Over the years the appendices have grown steadily and more than 5,000 species of animals, including nearly 1,700 species of birds, are currently listed in one or another of the appendices. See Discover CITES, http://www.cites.org/eng/disc/species.shtml (last visited July 13, 2007). Among the species of birds listed are accipiter melanoleucus, the Black Sparrowhawk, and falco cherrug, the Saker falcon. See Checklist of CITES Species, http://www.cites.org/common/resources/2003_CITES_CheckList.pdf. The Black Sparrowhawk has been listed since 1979 and the Saker falcon has been listed since 1975.

To promote the conservation of exotic birds Congress passed the Wild Bird Act, which prohibits the importation into the United States of any exotic bird of a species listed in any of CITES' three appendices. See 16 U.S.C. § 4904(c). Thus, it ordinarily violates the Wild Bird Act to import Black Sparrowhawks or Saker falcons into the United States. Violations may carry civil or criminal penalties. 16 U.S.C. § 4912. The Act provides, however, that the Secretary of the Interior may authorize importation of a species listed in a CITES appendix if (1) such importation is not detrimental to the survival of the species, and (2) the bird is being imported exclusively for any of four enumerated purposes. 16 U.S.C. § 4911. These four purposes are scientific research; personally owned pets of a person returning to the United States after being out of the country for at least one year; zoological breeding or display programs; and certain cooperative breeding programs. Id.

4

Pursuant to these provisions, the Secretary of the Interior has promulgated detailed regulations that require a party seeking to import an exotic bird pursuant to one of the exceptions to submit an application to the Wildlife Service demonstrating compliance with the statutory and regulatory requirements. 50 C.F.R. §§ 15.21-.26. Once obtained a permit is neither transferrable nor assignable. 50 C.F.R. § 13.25.

### B. Defendant Cullen's Actions

Cullen is New York's "acknowledged expert on birds of prey" and an internationally known and respected falconer. David Kocieniewski, City Eagle Expert Has Past Littered with Illegal Exotic Birds, N.Y. Times, Apr. 17, 2005, § 1, at 33. He claimed he once owned the largest private collection of birds of prey anywhere in this country and, at the time of his 2005 trial for violation of the Wild Bird Act, Cullen owned 47 birds of prey that he maintained at his home in Goshen, New York.

In 1999 there was only one living Black Sparrowhawk in captivity anywhere in North America. It was not owned by defendant. It seems Cullen wanted to add Black Sparrowhawks to his collection of exotic birds, but he could not fit himself within any of the specified exceptions to the Act's ban on their importation into the United States. That is, he had not been away from the United States for more than a year, so he could not come within the personally owned pet exception; he was conducting no scientific research, nor was he involved in zoological breeding or display programs; and he was not engaging in

5

cooperative breeding programs under the auspices of "an avicultural, conservation, or zoological organization." See 16 U.S.C. § 4911. In other words, there was no legal avenue for Cullen to follow to add Black Sparrowhawks from outside the United States to his collection of exotic birds.

Joseph and Kristen Kulak were Americans living abroad in England in 1999. They had each been abroad for more than a year. Were the Kulaks suddenly to decide to buy exotic birds as their personally owned pets, they would each qualify for the Wild Bird Act's personal pet exception. It turned out that Joseph Kulak worked for Cullen's wife in a large American insurance business with a branch in London. The Kulaks had no interest in Black Sparrowhawks and no background training or experience in handling them. Nonetheless, on October 27, 1999 Cullen mailed to the Wildlife Service applications signed by Joseph and Kristen Kulak indicating the Kulaks' desire to import into the United States three Black Sparrowhawks as their personally owned pets. Defendant also submitted to the Wildlife Service a receipt of purchase indicating the three Sparrowhawks had been sold to the Kulaks. According to the applications, two of the birds were Joseph Kulak's pets, while the third was Kristen Kulak's pet. In November 1999 the importation permits were granted.

Joseph Kulak's two pet Sparrowhawks (the third bird, ostensibly Kristen Kulak's pet, died in transit) arrived in the United States on January 6, 2000 from the United Kingdom. Cullen paid the purchase price for the birds that amounted to 500

6

English pounds sterling apiece. On June 10, 1999 when the birds were sold in England, 500 English pounds sterling was the equivalent of $800.10. See http://federalreserve.gov/releases/h10/19990614/ (exchange rate of $1.6002/pound on June 10). Defendant made and paid for all the travel arrangements for the birds from England to the United States.

Upon the birds' arrival in this country, Cullen went to the airport to pick them up. Ann Marie Holmes, the Wildlife Service Inspector at JFK Airport, doubted defendant's story that he was just picking up Kulak's birds on Kulak's behalf since Kulak was, after all, still living in England. As a result of her doubts she refused to turn the birds over to Cullen. She quarantined them in a facility run by the Department of Agriculture where, unfortunately, another one of the birds died. Subsequently, the one living Sparrowhawk was turned over to the Wildlife Service pending an investigation into whether or not the bird had been legally imported into the United States.

Meanwhile, Joseph Kulak had submitted an affidavit to the Wildlife Service reaffirming that the Sparrowhawk was his personal pet. Thus, in August 2000 the Sparrowhawk was released to Cullen with instructions that he return it to Kulak. Instead of turning the male bird over to Kulak, Cullen loaned it to Craig Culver, a breeder in California who owned North America's other Black Sparrowhawk, a female. Culver and Cullen entered into two "breeding loan agreements" that divvied up any future offspring. Neither of these agreements acknowledged that Kulak was the owner

7

of the male Sparrowhawk. In the end, the breeding was unsuccessful, and the male Sparrowhawk was returned to Cullen in New York.

## C. Prior Proceedings

On October 25, 2004 Cullen was charged with filing false statements to the Wildlife Service relating to the Black Sparrowhawks, and on January 3, 2005 a charge that he imported the Black Sparrowhawks in violation of the Wild Bird Act was added to the indictment. Cullen was also charged with importing into the United States a number of Saker falcons in violation of the Act.

Defendant filed a motion on February 4, 2005 to dismiss the charges under the Act arguing that it only covers birds born in the wild and only applies to importations for commercial purposes. Defendant also claimed that the Wild Bird Act is unconstitutionally vague because it provides no definition of the term "personally owned pet." Finally, Cullen declared he was entitled to a bill of particulars with regard to the various charges against him. The district court denied all of Cullen's motions.

Trial began in September 2005. Joseph Kulak testified for the government pursuant to a non-prosecution agreement. According to Kulak, Cullen had asked him if he and his wife would be willing to import birds to the United States for Cullen, and Kulak agreed. Kulak explained that Cullen paid all costs associated with the purchase and importation of the Sparrowhawks

8

and that all Kulak did was forward documents relating to their importation to certain persons as directed by Cullen. Kulak testified that the Sparrowhawks were not his personally owned pets, despite his signature on the Wildlife Service application attesting that they were. He concluded by stating that he signed the application as a personal favor to Cullen and his wife. Kristen Kulak testified similarly. Defendant took the stand in his own defense, and though he admitted he paid for, took care of, and made all the arrangements for the birds, he insisted he did this as a favor to Kulak.

The jury returned a guilty verdict on both counts relating to the Black Sparrowhawks, but acquitted defendant of the charge relating to the importation of the Saker falcons. On January 26, 2006 Cullen was sentenced to four months imprisonment, three years supervised release, a $1,000 fine, and a special assessment of $200. Judge McMahon refused to grant Cullen's request that the sentence be stayed pending appeal. On February 1, 2006 Cullen timely filed a notice of appeal.

DISCUSSION

I  Standard of Review

We review de novo challenges to the meaning and constitutionality of statutes and the propriety of jury instructions. United States v. Giordano, 442 F.3d 30, 38-39 (2d Cir. 2006), cert. denied, 127 S. Ct. 1253 (2007).

II  Captive-Bred Birds and the Wild Bird Conservation Act

The Wild Bird Act's importation ban applies to "any exotic bird of a species that is listed" in an appendix to CITES.  16 U.S.C. § 4904(c); see also id. § 4903(2) (defining "exotic bird" as "any live or dead member of the class Aves that is not indigenous to the 50 States or the District of Columbia").  Cullen argues that the statute's title and legislative history suggest that Congress was primarily interested in conserving birds in the wild when it passed the Wild Bird Act, and thus the Act does not prohibit the importation of captive-bred birds such as the Sparrowhawks that he imported.  Yet, nothing in the language of the statute itself supports Cullen's assertion.  Quite the contrary -- the statute provides that any exotic bird listed in the appendices to CITES is covered, with no limiting language as to where or how an exotic bird is bred.  The word "any" means "without restriction or limitation."  Tambe v. Bowen, 839 F.2d 108, 110 (2d Cir. 1988).  Further, a Wild Bird Act provision mandating the Secretary of the Interior to exempt selected captive-bred species from the Act's prohibitions on importation, see 16 U.S.C. § 4905(b), conclusively demonstrates that Congress aimed to have all other captive-bred species, like the Black Sparrowhawk, covered under the Act.  Otherwise this exemption would be meaningless.

When statutory language is unambiguous, as the pertinent language in this Act is, we need not look to its title or history to determine its meaning.  See, e.g., Conn. Nat'l Bank v.

10

*Germain*, 503 U.S. 249, 253-54 (1992); see also *Collazos v. United States*, 368 F.3d 190, 196 (2d Cir. 2004) ("While a title may be a useful tool[] . . . for the resolution of a doubt about the meaning of a statute, a title . . . cannot limit the plain meaning of unambiguous text.").  Like a book by its cover, this statute should not be judged by its title.

### III  The Personal Pet Exception

Cullen also complains that the Wild Bird Act lacks a definition for the term "personally owned pet."  According to appellant, this term is so vague that it would be unfair to punish him for his actions, since he reasonably thought his actions would fit within the personal pet exception.  We analyze this argument in more detail.

As the Supreme Court teaches, even if it is unlikely that a person planning to violate a law will search out its text before acting, "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.).  For the warning to be fair "the line should be clear." *Id*.  The fair warning requirement appears in various different legal doctrines, two of which are raised by Cullen:  void for vagueness and the canon of strict construction of criminal laws, which resolves ambiguities under a rule of lenity, so that a statute applies only to conduct clearly covered. *United States v. Lanier*, 520 U.S. 259, 266 (1997).

11

## A. Void for Vagueness

There are two distinct parts to any void for vagueness analysis. The fair warning requirement noted earlier ensures that a penal statute defines criminal conduct precisely enough that ordinary people can comprehend what conduct is proscribed. See Kolender v. Lawson, 461 U.S. 352, 357 (1983). Although we recognize in many English words there lurk uncertainties, see Rose v. Locke, 423 U.S. 48, 50 (1975) (per curiam), to meet the fair warning prong an ounce of common sense is worth more than an 800-page dictionary. The second, more important aspect of the void for vagueness doctrine requires that a statute "establish minimal guidelines to govern law enforcement" so that police, prosecutors and juries may not pursue their own personal preferences. Kolender, 461 U.S. at 358.

Focusing on the case at hand "personal" and "pet" are words that are comprehensible to an ordinary person. The common meanings of these words, coupled with the Wild Bird Act's explicit provisions as to who qualifies for the personal pet exception, gave adequate notice to defendant that the activities he was planning did not fit within the pet exception. An ordinary person would realize that an exception to the import ban for personally owned pets of repatriating Americans would not apply if a person living in the United States asked an American living abroad to pretend that birds being imported belonged to the person living abroad. And the Act's provisions detailing who qualifies for the personal pet exception establish more than

12

minimal guidelines to govern those charged with the Act's enforcement.

### B. Rule of Lenity

The rule of lenity, which appellant presses on this appeal, only comes into play when a court after looking at all aids to legislative meaning can do no more than "guess as to what Congress intended." Muscarello v. United States, 524 U.S. 125, 138 (1998). To invoke lenity there must be grievous ambiguity in a statute. Id. at 138-39. Such may not reasonably be said to be the case with this statute.

### IV The Jury Instruction

Appellant's next contention is that the trial court erred by instructing the jury that the government had to prove "the bird was not imported exclusively for the purpose stated in the import permit." He maintains the district judge misinterpreted the Act as allowing importation only if the applicant relied exclusively on one -- and not more than one -- of the enumerated purposes. According to Cullen, the interpretation matters to his case because he had made known to the Wildlife Service that he intended to import the birds not only as personal pets but also for breeding. The relevant statutory language is as follows: "[T]he Secretary may . . . authorize the importation of a bird of the species if the Secretary determines that such importation is not detrimental to the survival of the species and the bird is being imported exclusively for any of the following purposes[.]" 16 U.S.C. § 4911 (emphasis added). The statute then specifies

13

the four exceptions already noted: scientific research; personally owned pets of a person returning to the United States after being out of the country for at least a year; zoological breeding or display programs; and certain cooperative breeding programs. Id.

We do not need to resolve whether Cullen is correct that the district judge should have instructed the jury that the government was required to prove the bird was not imported for one or more statutory purposes. The error, if there was one, was harmless because the only exception listed in § 4911 that could even arguably have applied to Cullen was the personal pet exception. Appellant makes much of the fact that he intended to breed the birds, but there is no generalized breeding exception set out in the Act. Instead, there are specific exceptions for zoological breeding or display programs and for cooperative breeding programs under the auspices of an avicultural, conservation, or zoological organization. See 16 U.S.C. § 4911. Appellant has never claimed that he was engaged in zoological breeding or display programs, nor has he averred that he manages a cooperative breeding program under the auspices of an avicultural, conservation, or zoological organization. Consequently, whether or not one could be convicted under the Wild Bird Act for importing a bird for a set of dual purposes both covered by § 4911's exceptions is irrelevant in this case. Judge McMahon's instruction to the jury that it inquire into whether the Black Sparrowhawks were imported exclusively for the

14

purpose stated in the import permit was correct or at worst harmless error.

V   Other Claims

Cullen insists that if his stated dual purpose ran afoul of the Act, then the government should have rejected his application for an importation permit.  Thus, appellant's contention seems to be that having issued the permit with full awareness of defendant's plans, the government should not now be allowed to turn around and later prosecute him for taking the very steps to carry out his plans that it had earlier approved.  This argument is disingenuous because appellant made material misrepresentations in the importation application and made false statements regarding the ownership of the birds.  Had the government been fully aware of defendant's plans -- had he been honest from the outset -- the Wildlife Service most certainly would have rejected his application for an importation permit. Having made misrepresentations to the Wildlife Service every step of the way, Cullen cannot now successfully argue that the government knew all along that what he was doing was illegal and thus should not have granted him an importation permit.

We have reviewed appellant's remaining arguments and concluded that none of them has merit.

CONCLUSION

Accordingly, for the reasons stated above, the judgment of the district court convicting defendant Cullen of violating the Wild Bird Act by unlawfully importing exotic birds into the

15

United States and for filing false statements with the Wildlife Service is affirmed.