**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WAG MORE DOGS, LIMITED
LIABILITY CORPORATION,
            *Plaintiff-Appellant,*

v.

NORMA J. COZART, in her official
capacity as (acting) Zoning
Administrator for Arlington
County, Virginia; ARLINGTON
COUNTY, Virginia,
            *Defendants-Appellees.*

No. 11-1226

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:10-cv-01347-LMB-TCB)

Argued: March 21, 2012

Decided: May 22, 2012

Before DUNCAN, KEENAN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion,
in which Judge Duncan and Judge Keenan joined.

**COUNSEL**

**ARGUED:** Robert Peller Frommer, INSTITUTE FOR JUS-TICE, Arlington, Virginia, for Appellant. Carol Winfield McCoskrie, COUNTY ATTORNEY'S OFFICE, Arlington, Virginia, for Appellees. **ON BRIEF:** Robert J. McNamara, William H. Mellor, III, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellant. MinhChau N. Corr, COUNTY ATTORNEY'S OFFICE, Arlington, Virginia, for Appellees.

**OPINION**

DIAZ, Circuit Judge:

Wag More Dogs, LLC appeals the district court's dismissal of its complaint, which alleged that Arlington County's sign ordinance violated the First Amendment. We agree with the district court that the ordinance is a content-neutral restriction on speech that satisfies intermediate scrutiny. Finding no merit to the other constitutional challenges, we affirm.

I.

A.

Like most local governments throughout the country, Arlington County ("Arlington") has enacted a comprehensive zoning ordinance. Several provisions of the zoning ordinance pertain to the display of signs ("Sign Ordinance"). Arlington enacted the Sign Ordinance to "regulate the construction, placement and display of signs in order to maintain the health, safety, convenience and welfare of residents and businesses of the County, as well as the overall visual appearance through-out the County." Arlington County, Va., Zoning Ordinance § 34.[1] Among other aims, Arlington promulgated the Sign

---

[1]We consult the addenda to the parties' briefs for the text of the Sign Ordinance.

Ordinance to "reduce the traffic hazards caused by . . . unregulated signs" and to enhance the aesthetic environment of the County. *Id.*

The Sign Ordinance defines "sign" as "[a]ny word, numeral, figure, design, trademark, flag, pennant, twirler, light, display, banner, balloon or other device of any kind which, whether singly or in any combination, is used to direct, identify, or inform the public while viewing the same from outdoors." *Id.* § 34(B). It further provides as a general rule that "[a] sign permit shall be obtained from the Zoning Administrator before any sign or advertising is erected, displayed, replaced, or altered so as to change its overall dimensions." *Id.* § 34(A)(1).

Two categories of signs are not subject to the permit process. The first, a list of signs permitted in all zoning districts without permits, includes fifteen types of signs and covers such rudimentary postings as official notices required by law, "no trespassing" signs, and directional signs. *Id.* § 34(E). A second category lists fourteen types of prohibited signs—most of which involve jarring or otherwise-distracting displays—for which no permit may be issued. *Id.* § 34(C). A catchall provision allows noncommercial speech on a sign wherever commercial speech is permitted. *Id.* § 34(A)(4).

The Sign Ordinance sets out intricate requirements for various types of signs located in different zoning districts. Relevant to this appeal, a provision includes size regulations for businesses in "C" and "M" districts ("Business Sign Provision"). *Id.* § 34(G). The Business Sign Provision mandates that an individual obtain a sign permit before erecting a "business sign"—that is, a sign "identifying the products or services available on the premises or advertising a use conducted thereon." *Id.* "On the walls of commercial buildings in all 'C' and 'M' Districts," businesses are allowed to display "up to three (3) signs for each tenant, up to a maximum total sign area of sixty (60) square feet per tenant, or a total sign area

of one (1) square foot per linear foot of the tenant's frontage, whichever is greater." *Id.* § 34(G)(1).

If a proposed sign does not otherwise qualify for a permit under the Sign Ordinance but does not fall under the prohibited-signs category, an individual may seek a special exception through a "comprehensive sign plan." *Id.* § 34(A)(3). The provision detailing the process through which Arlington evaluates applications for a comprehensive sign plan ("Comprehensive Sign Plan Provision") states as follows:

> Use permits may be issued for any of the special exceptions or conditional uses for which a use permit is required by the provisions of this ordinance; provided, that the County Board shall find that after a duly advertised hearing, the use will not: (1) affect adversely the health or safety of persons residing or working in the neighborhood of the proposed use; (2) be detrimental to the public welfare or injurious to property or improvements in the neighborhood; (3) be in conflict with the purposes of the master plans of the County.

*Id.* § 36(G)(1).

Individuals who violate the Sign Ordinance are initially subject to civil penalties. Arlington imposes a $200 fine on a first-time violator, and fines steadily increase for subsequent transgressions. *Id.* § 37(D)(1). When an individual has accrued $5000 or more in fines, Arlington may prosecute the violation as a criminal misdemeanor. *Id.* § 37(G).

### B.

Kim Houghton owns and maintains Wag More Dogs, LLC ("Wag More Dogs"), a "doggy daycare" business located in an "M" district in Arlington, Virginia. Houghton sought to

position her store near the Shirlington Dog Park, ultimately renting a space in 2009 adjacent to the park. In an effort to "beautify the area" and to "create goodwill with the people who frequented the dog park, many of whom were potential Wag More Dogs customers," Houghton commissioned a painting on the rear of the business's building. J.A. 8. The final product, measuring approximately 960 square feet, incorporated some of the cartoon dogs in Wag More Dogs' logo. Houghton described it as including "happy cartoon dogs, bones, and paw prints." *Id.* 5.

On August 13, 2010, Arlington County Zoning Administrator Melinda Artman emailed Houghton to inform her that the painting violated the Sign Ordinance. Specifically, the painting exceeded the size limitations imposed on signs displayed in "M" districts, in contravention of section 34(G)(1) of the Sign Ordinance. Artman stated that an administrative lock would remain on the building permit until Houghton cured the violations. Houghton could either paint over the display or apply for a comprehensive sign plan to maintain compliance with the Sign Ordinance, though her chances of success with the latter option were dubious, according to Artman. In the interim, Artman told Houghton to cover the painting with tarps if she elected not to paint over it.

Houghton followed up with Artman by email, asking what steps she could take to ensure that the painting was not considered a business sign. Artman responded as follows:

> For the mural to NOT be considered a sign, it may depict anything you like EXCEPT something to do with dogs, bones, paw prints, pets, people walking their dogs, etc. In other word [sic], the mural can not [sic] show anything that has any relationship with your business. If it does, then it becomes a sign.

*Id.* 37. Houghton ultimately covered the painting with tarps, and Artman released the lock on her building. Artman subse-

quently issued Wag More Dogs a final certificate of occupancy on September 27, 2010, under the condition that the tarps remain in place over the painting.

About two weeks later, Arlington officials sought to reach an accommodation with Houghton so that she could remove the tarps while keeping the painting mostly intact. They told her that she could include the words "Welcome to Shirlington Park's Community Canine Area" above the artwork, which would convert the painting from an impermissible sign into an informational sign not requiring a permit under the Sign Ordinance. Houghton declined.

### C.

Unable to display the painting because it violated the Sign Ordinance, Wag More Dogs filed suit against Artman[2] and Arlington. It challenged the Sign Ordinance on a variety of First Amendment grounds. Wag More Dogs first contended that the Sign Ordinance was an impermissible content-based restriction on speech, both facially and as applied to the business. It then alleged that the Sign Ordinance was unconstitutionally vague. Augmenting the vagueness attack by referencing Artman's email to Houghton, Wag More Dogs claimed that Artman enforced the ordinance using an impermissibly vague "any relationship" test—i.e., she would consider any display to constitute a "business sign" if it had any relationship to the on-site business. Wag More Dogs further alleged that the Comprehensive Sign Plan Provision operated as an unconstitutional prior restraint on speech. Finally, it claimed that Arlington's offer of accommodation—in which Houghton could display the painting if she included above the artwork "Welcome to Shirlington Park's Community Canine Area"—qualified as unconstitutionally compelled speech.

---

[2]Norma J. Cozart has since been named Arlington's acting zoning administrator, replacing Artman. Cozart has been substituted for Artman as a defendant on appeal.

Wag More Dogs sought declaratory and injunctive relief for these alleged First Amendment violations.

Wag More Dogs filed a motion for a preliminary injunction, while Arlington and Artman moved to dismiss the complaint. The district court granted the motion to dismiss with prejudice and denied the motion for a preliminary injunction as moot. The court initially held that the Sign Ordinance was a content-neutral restriction on speech that easily satisfied intermediate scrutiny, rejecting Wag More Dogs' facial and as-applied challenges. The court further found no merit to Wag More Dogs' vagueness challenges. It first concluded that the Sign Ordinance's definition of "sign," when read in the context of the rest of the regulation, was not impermissibly vague. The court next held that Wag More Dogs had not plausibly alleged that Arlington uses the "any relationship" test as a decisive interpretation, and, in any event, the standard is not unduly vague. Finally, the court rejected Wag More Dogs' allegations that the Comprehensive Sign Plan Provision qualified as an unconstitutional prior restraint on speech and that Arlington had impermissibly compelled its speech.

Wag More Dogs appeals the district court's dismissal of its complaint and denial of its request for a preliminary injunction.

## II.

We review de novo the district court's grant of a motion to dismiss, *Lebron v. Rumsfeld*, 670 F.3d 540, 547 (4th Cir. 2012), accepting as true the facts alleged in the complaint, *see Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

To survive a motion to dismiss, a plaintiff must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Although we are constrained to " 'take

the facts in the light most favorable to the plaintiff,' " we need not accept legal conclusions couched as facts or " 'unwarranted inferences, unreasonable conclusions, or arguments.' " *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'Ship*, 213 F.3d 175, 180 (4th Cir. 2000)). At bottom, a plaintiff must "nudge[ ] [its] claims across the line from conceivable to plausible" to resist dismissal. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.

The heart of Wag More Dogs' complaint is that the Sign Ordinance is an impermissible content-based restriction on speech, both facially and as applied, that cannot survive strict scrutiny. We disagree and hold that the Sign Ordinance is content neutral on its face. As applied to Wag More Dogs, the regulation is a restriction on commercial speech. Because the Sign Ordinance satisfies intermediate scrutiny, Wag More Dogs' content-based challenges lack merit.

## A.

Wag More Dogs advances a syllogistic argument to support its claim that the Sign Ordinance is unconstitutional on its face as a content-based restriction on speech: Any regulation that differentiates between types of speech is content based. The Sign Ordinance imposes different requirements on different types of speech. Therefore, the Sign Ordinance is content based. But Wag More Dogs would have us hew to a Euclidean commitment to wooden logic, where the law instead demands a more pragmatic judgment. Viewing the Sign Ordinance with reference to precedent that applies a practical analysis of content neutrality, requiring that a regulation do more than merely differentiate based on content to qualify as con-

tent based, we conclude that the Sign Ordinance is content neutral and satisfies intermediate scrutiny.[3]

### 1.

Eschewing a formalistic approach to evaluating content neutrality that looks only to the terms of a regulation, the Supreme Court has instead embraced a more practical inquiry. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 719–20 (2000). "The principal inquiry in determining content neutrality," the Court has declared, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 719 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Ward*, 491 U.S. at 791 ("The government's purpose is the controlling consideration."). The Court has "repeatedly explained" that "government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated

---

[3]We reject at the outset Wag More Dogs' literally unprecedented contention that the district court improperly dismissed the case absent Arlington and Artman's production of evidence justifying the Sign Ordinance's restrictions. Wag More Dogs concedes that, were we to accept the proposition, dismissal would effectively never be appropriate in the context of a First Amendment challenge, as the inquiry starts and stops with facts alleged in the plaintiff's complaint and gives the government no opportunity to test the plausibility of the claim by producing evidence. Unsurprisingly, Wag More Dogs cites no authority supporting this bold argument. The cases it references stand for nothing more than the unremarkable principle that "the party seeking to uphold a restriction of commercial speech carries the burden of justifying it," a burden that "is not satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (internal quotations omitted); *see also Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011) ("[I]t is the State's burden to justify its content-based law as consistent with the First Amendment."). As explained below, consistent with over thirty years of case law from the Supreme Court and our court, Arlington has established that the Sign Ordinance passes constitutional muster under the rubric of intermediate scrutiny. It need not reinvent the wheel by coming forward with voluminous evidence justifying a regulation of the type that has been upheld several times over. Dismissal was therefore proper.

speech." *Hill*, 530 U.S. at 720. This is so even if the regulation "has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.[4]

Distilling the principles enunciated by the Court in *Hill*, we have established a three-pronged test for evaluating content neutrality:

> [A] regulation is not a content-based regulation of speech if (1) the regulation is not a regulation of speech, but rather a regulation of the places where some speech may occur; (2) the regulation was not adopted because of disagreement with the message the speech conveys; or (3) the government's interests in the regulation are unrelated to the content of the affected speech.

*Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 433 (4th Cir. 2007) (internal quotations and alteration omitted). The plain text of a regulation, to be sure, is a factor important to our analysis. *E.g.*, *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 353–54 (4th Cir. 2001). But we have not hesitated to deem a regulation content neutral even if it facially differentiates between types of

---

[4]Despite Wag More Dogs' suggestions to the contrary, the Supreme Court's decision in *Sorrell* did not signal the slightest retrenchment from its earlier content-neutrality jurisprudence. Finding that the statute at issue discriminated based on content, the Court grounded its holding on the statute's facial discrimination between types of speech coupled with legislative history dispelling "[a]ny doubt that" the regulation "impose[d] an aimed, content-based burden on [pharmaceutical] detailers" and "burden[ed] disfavored speech by disfavored speakers." *Sorrell*, 131 S. Ct. at 2663. Indeed, the Court noted that the enacting legislature had hoped to stymie the speech of pharmaceutical detailers through passage of the statute. *Id.* at 2663–64. At its core, the law qualified as content based because it embodied government creation of " 'a regulation of speech because of disagreement with the message it conveys.' " *Id.* at 2664 (quoting *Ward*, 591 U.S. at 791). Preceding Supreme Court decisions—and our analysis in this case—are entirely consistent with *Sorrell*.

speech. *E.g.*, *Covenant Media*, 493 F.3d at 434–35 (adjudging city ordinance content neutral, even though it treated different types of speech differently, because it "serve[d] purposes unrelated to the content of expression" and "did not regulate the location of different types of signs based on the ideas or views expressed" (internal quotations omitted)); *Am. Legion Post 7 v. City of Durham*, 239 F.3d 601, 608–09 (4th Cir. 2001) (upholding city ordinance as content-neutral restriction on speech, even though it differentiated between commercial and noncommercial speech). A statute's differentiation between types of speech does not inexorably portend its classification as a content-based restriction.

Cognizant that "[e]ach method of communicating ideas is a 'law unto itself' " and that our jurisprudence "must reflect the 'differing natures, values, abuses and dangers' of each method," *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981) (plurality) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949) (Jackson, J., concurring)), we pay here particular attention to cases addressing sign regulations. The Supreme Court in *Metromedia* weighed the constitutionality of a sign ordinance. Generally speaking, the ordinance permitted on-site commercial advertising but prohibited other forms of commercial advertising and most noncommercial communications. *Id.* at 503. Noncommercial messages were permitted only if they fell into one of twelve specified exceptions. *Id.* at 494–95. The Court invalidated the ordinance as an unconstitutional content-based restriction on speech. The plurality cited two principal constitutional defects. First, the regulation privileged commercial speech over noncommercial speech, inverting the constitutional protection afforded each type of speech. *Id.* at 513. Second, the city through its exceptions to the general ban on noncommercial signs impermissibly distinguished between "various [noncommercial] communicative interests." *Id.* at 514–15.

We drew on *Metromedia* in evaluating the content neutrality of a sign regulation in *Covenant Media*. The ordinance

there distinguished between on-premises signs and off-premises signs. On-premises signs were defined as "signs identifying or advertising a business, person, or activity, or goods, products, services or facilities located on the premises where the sign is installed." *Covenant Media*, 493 F.3d at 425 (internal quotations omitted). Off-premises signs were "signs identifying or advertising a business, person, or activity, or goods, products, services or facilities not located on the premises where the sign is installed or directing persons to a different location from where the sign is installed." *Id.* (internal quotations omitted). The sign regulation imposed size and location requirements on off-premises signs and mandated receipt of a permit prior to construction of such a sign. *Id.* The regulation drew further distinctions between types of signs within the two principal categories, imposing varying requirements on, e.g., directional, instructional, memorial, and public signs. *Id.* at 434.

We held that the ordinance was content neutral. We first stressed that the city adopted the ordinance to regulate land use, "not to stymie any particular message." *Id.* Indeed, the interests proffered by the city—securing traffic safety, promoting the efficient transfer of information, and enhancing the area's aesthetics—were completely unrelated to the content of messages displayed. *Id.* We succinctly rejected the argument advanced by the plaintiff, one that mirrors that set forth by Wag More Dogs:

> To be sure, the Sign Regulation defined and distinguished between different types of signs. And we recognize that distinguishing between different types of signs and where those signs may be located may also in effect distinguish where certain content may be displayed. But a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. The Sign Regu-

lation did not regulate the location of different types of signs based on the ideas or views expressed.

*Id.* (citations and internal quotations omitted). The regulation moreover did not suffer from the constitutional infirmities that plagued the ordinance in *Metromedia*. First, the regulation did not afford greater protection to commercial speech than noncommercial speech. *Id.* at 433 n.9. Second, although the regulation drew distinctions between types of noncommercial speech—imposing different restrictions on directional signs, memorial signs, and the like—the framework of the ordinance counseled reaching a different outcome from the *Metromedia* Court. *Id.* Whereas the ordinance in *Metromedia* operated as a general prohibition on noncommercial signs, the regulation in *Covenant Media* "generally allowed all signs regardless of message, applying only time, place, and manner restrictions." *Id.*

Applying *Hill* and *Covenant Media* to the Sign Ordinance, we have no trouble concluding that it is a content-neutral regulation. As an initial matter, Wag More Dogs has not alleged—nor could it—that Arlington has regulated speech through the Sign Ordinance "because of disagreement with the message it conveys," which is the "principal inquiry in determining content neutrality," *Hill*, 530 U.S. at 719 (quoting *Ward*, 491 U.S. at 791). As with the city in *Covenant Media*, Arlington adopted the Sign Ordinance to regulate land use, not to stymie a particular disfavored message. On this score, then, the Sign Ordinance's content neutrality is incandescent.

Moving to the text of the Sign Ordinance, we acknowledge that Arlington has differentiated between types of speech. For instance, the regulation imposes size requirements on "business signs" that do not similarly apply to noncommercial signs, and it exempts fifteen types of signs from its coverage. But this varying treatment is not sufficient to convert the Sign Ordinance into a content-based restriction on speech. Arlington enacted the ordinance to, among other aims, promote traf-

fic safety and the County's aesthetics, interests unrelated to messages displayed. Thus " 'even if it has an incidental effect on some speakers or messages but not others,' " the Sign Ordinance is nevertheless content neutral because it " 'serves purposes unrelated to the content of expression,' " *Covenant Media*, 493 F.3d at 434 (quoting *Ward*, 491 U.S. at 791). The Sign Ordinance is moreover distinguishable from the invalidated regulation in *Metromedia*. In contrast to that enactment, the Sign Ordinance does not privilege commercial speech above noncommercial speech, Arlington County, Va., Zoning Ordinance § 34(A)(4) ("Wherever commercial speech is permitted on a sign under this section of the ordinance, noncommercial speech also is permitted."). And like the ordinance in *Covenant Media*, the Sign Ordinance departs from the *Metromedia* regulation in that it "generally allow[s] all signs regardless of message, applying only time, place, and manner restrictions." *Covenant Media*, 493 F.3d at 433 n.9.

That Arlington officials must superficially evaluate a sign's content to determine the extent of applicable restrictions is not an augur of constitutional doom. *See, e.g.*, *Hill*, 530 U.S. at 722 ("We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct."). "For a regulation with a clear content-neutral purpose to be content based, there must be a more searching inquiry into the content." *Covenant Media*, 493 F.3d at 434. As in *Covenant Media*, the Sign Ordinance's objectives, which seek to "address problems caused by signs wholly apart from any message conveyed," mitigate any concern that the " 'kind of cursory examination' " brought about by "looking generally at what type of message a sign carries to determine where it can be located" renders the regulation content based. *See id.* at 434–35 (quoting *Hill*, 530 U.S. at 721).

2.

Deeming the Sign Ordinance content neutral, we now readily conclude that it satisfies intermediate scrutiny. A content-

neutral regulation passes constitutional muster "if it furthers a substantial government interest, is narrowly tailored to further that interest, and leaves open ample alternative channels of communication." *Am. Legion*, 239 F.3d at 609. The Sign Ordinance meets all three standards.

Arlington enacted the Sign Ordinance to, in part, promote traffic safety and enhance the County's aesthetics. Both are substantial government interests. *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) (aesthetics); *Metromedia*, 453 U.S. at 507–08 (plurality) (aesthetics and traffic safety). The Sign Ordinance is narrowly tailored to further its interest in traffic safety and aesthetics, as its size and location restrictions "d[o] no more than eliminate the exact source of the evil it sought to remedy," *Taxpayers*, 466 U.S. at 808 (ruling that government may impose even a flat ban on certain classes of signs). Finally, the Sign Ordinance "leaves open ample alternative channels of communication," *Am. Legion*, 239 F.3d at 609, by generally permitting the display of all types of signs, subject only to size and location restrictions. To take an example from this dispute, Wag More Dogs could display its painting if it were no larger than sixty square feet.

### B.

Wag More Dogs also attacks the Sign Ordinance as applied to it. Characterizing its painting as noncommercial speech, Wag More Dogs maintains that Arlington impermissibly restricted its sign while allowing other noncommercial messages to stand. We reject the premise, however, and conclude that the painting is commercial speech. Because Arlington's regulation of Wag More Dogs' commercial speech satisfies intermediate scrutiny, we must turn aside the business's as-applied challenge.

### 1.

"Because the degree of protection afforded by the First Amendment depends on whether the activity sought to be reg-

ulated constitutes commercial or non-commercial speech, we must first determine the proper classification of the [mural] at issue here." *Bolger v. Youngs Prods. Corp.*, 463 U.S. 60, 65 (1983). In *Bolger*, the Supreme Court observed that "the core notion of commercial speech" is "speech which does 'no more than propose a commercial transaction.' " *Id.* at 66 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980) (stating that commercial speech is "expression related solely to the economic interests of the speaker and its audience").

*Bolger* recognized a broader definition of commercial speech, encompassing speech that "cannot be characterized merely as proposals to engage in commercial transactions." 463 U.S. at 66. Before the Court in *Bolger* was an informational pamphlet distributed by a manufacturer of prophylactics. *Id.* at 68. The pamphlet discussed the utility of condoms in preventing the spread of sexually transmitted diseases. *Id.* at 62 & n.4. It identified the manufacturer only on the last page, which stated that the firm had contributed the pamphlet as a public service. *Id.* Despite the pamphlet's plainly not falling within "the core notion of commercial speech," the Court nevertheless deemed it commercial speech. *Id.* at 66–68. A combination of three factors "provide[d] strong support" for the Court's conclusion: the manufacturer conceded that the pamphlet was advertising, a specific product was referenced, and the manufacturer had an economic motivation for mailing the pamphlets. *Id.* at 66–67. The Court cautioned that it did not "mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial." *Id.* at 67 n.14.

The three factors relied on by the Court in *Bolger* similarly counsel classifying Wag More Dogs' painting as commercial speech. First, Wag More Dogs alleged in its complaint that the painting was meant to attract customers from the nearby

dog park, which is tantamount to conceding that it was advertising. Second, the painting included cartoon dogs from the business's logo. Because Wag More Dogs offers services rather than goods, the inclusion of part of its logo is analogous to referencing a specific product. Third, Wag More Dogs certainly had an economic motivation for displaying the painting, as it admitted in its complaint that it sought to "create goodwill with the people who frequented the dog park, many of whom were potential . . . customers," J.A. 8. When viewed through the lens of *Bolger*, Wag More Dogs' complaint fails to plausibly allege that the painting qualifies as noncommercial speech.

2.

As applied to Wag More Dogs, the Sign Ordinance's regulation of commercial speech satisfies intermediate scrutiny. To sustain its content-based regulation of commercial speech, Arlington "must show at least that the [Sign Ordinance] directly advances a substantial governmental interest and that the measure is drawn to achieve that interest," *Sorrell*, 131 S. Ct. at 2667–68. Arlington has met that burden. *See supra* Part III.A.2. The Sign Ordinance is therefore constitutional as applied to Wag More Dogs.

IV.

Wag More Dogs asserts finally that the Sign Ordinance is unconstitutionally vague and that the Comprehensive Sign Plan Provision operates as an unlawful prior restraint.[5] We disagree.

---

[5]On appeal, Wag More Dogs has abandoned its claim of compelled speech.

A.

Wag More Dogs alleges that the Sign Ordinance is vague in two respects: in its definition of "sign," and through Arlington's enforcement of the regulation pursuant to a purported "any relationship" test. Both assertions lack merit.

1.

We first consider—and reject—Wag More Dogs' contention that the capaciousness of the Sign Ordinance's general definition of "sign" renders the entire regulation void for vagueness.

Regulations can be struck down as impermissibly vague for either of two reasons. First, a regulation can "fail[ ] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732. Second, a regulation can "authorize[ ] or even encourage[ ] arbitrary and discriminatory enforcement." *Id.* We do not hold legislators to an unattainable standard when evaluating enactments in the face of vagueness challenges. "[W]hile there is little doubt that imagination can conjure up hypothetical cases in which the meaning of . . . terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 733 (citation and internal quotations omitted); *see also Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 749 (4th Cir. 2010) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." (quoting *Ward*, 491 U.S. at 794)). Thus we "must ask whether the government's policy is 'set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.' " *Imaginary Images*, 612 F.3d at 749 (quoting *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006)). Dictionary definitions and old-fashioned common sense facilitate the inquiry. *Id.* at 750; *see also United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007)

("[T]o meet the fair warning prong an ounce of common sense is worth more than an 800-page dictionary.").

We are mindful that our task is not to dream scenarios in which a regulation might be subject to a successful vagueness challenge. The Supreme Court has instructed that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " *Hill*, 530 U.S. at 733 (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)).

Because the Sign Ordinance "provide[s] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" and does not "authorize[ ] . . . arbitrary and discriminatory enforcement," *id.* at 732, it is not susceptible to attack on vagueness grounds. First, we note that Wag More Dogs' attempts to attack the Sign Ordinance's general definition of "sign" are unavailing. That definition necessarily interacts with the other provisions of the Sign Ordinance, including, as is pertinent here, the Business Sign Provision. Wag More Dogs' entreaties to view the definition of "sign" in a vacuum and envision ways in which the provision is inadequate amount to no more than the kind of "speculation about possible vagueness in hypothetical situations" that we will not consider, *id.* at 733. Wag More Dogs has simply not alleged that application of the "sign" definition undermines the conclusion that the Sign Ordinance "is surely valid 'in the vast majority of its intended applications,' " *id.* (quoting *Raines*, 362 U.S. at 23).

Concluding that Wag More Dogs is unable to prevail on its attack of the general "sign" definition, we turn to its challenge to the Business Sign Provision. Wag More Dogs effectively grants that the Sign Ordinance's definition of "business sign" is valid—and for good reason. The regulation defines "business sign" as a sign "identifying the products or services available on the premises or advertising a use conducted

thereon." Arlington County, Va., Zoning Ordinance § 34(G). We have little trouble finding that "the ordinary person exercising ordinary common sense can sufficiently understand and comply with" the Business Sign Provision, *see Imaginary Images*, 612 F.3d at 749 (quoting *Carandola*, 470 F.3d at 1079). Indeed, other courts and litigants confronting similar definitions in sign codes have not questioned them on vagueness grounds. *See, e.g.*, *Metromedia*, 453 U.S. at 493–94; *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 98 n.3 (2d Cir. 2010).

2.

Turning to the standards of enforcement, Wag More Dogs alleges that Arlington subjects to the strictures of the Business Sign Provision a display "that has any relationship" to an on-site business. Even casting aside the dubious plausibility of its allegations that Arlington employs such a standard, we find that Wag More Dogs has fallen far short of alleging a pattern of discriminatory enforcement necessary to give rise to a vagueness challenge on these grounds.

When the terms of a regulation are clear and not subject to attack for vagueness, the plaintiff bears a high burden to show that the standards used by officials enforcing the statute nevertheless give rise to a vagueness challenge. *See Green v. City of Raleigh*, 523 F.3d 293, 306 (4th Cir. 2008). We will evaluate alleged vagueness in the enforcement of an otherwise-valid statute only "if and when a pattern of unlawful favoritism appears." *Id.* (internal quotations omitted). "Until this occurs, however," a plaintiff pressing such a challenge will have "failed to demonstrate that the ordinance[ ] [is] unconstitutional." *Id.*

Wag More Dogs has not come close to alleging that Arlington's enforcement of the Sign Ordinance reveals " 'a pattern of unlawful favoritism,' " *id.* (internal quotations omitted). Wag More Dogs' complaint focuses exclusively on its dispute

with Arlington, failing to detail other enforcement actions that would evince the requisite pattern of arbitrariness. Finding its contentions on this score nothing more than "speculation about possible vagueness in hypothetical situations not before [us]," *Hill*, 530 U.S. at 733, we reject Wag More Dogs' challenge to Arlington's standards of enforcement.

B.

Finally, Wag More Dogs alleges that the Comprehensive Sign Plan Provision operates as an unlawful prior restraint on speech. We disagree, concluding that the provision meets the standards required of content-neutral licensing regulations.

To pass constitutional muster, a content-neutral licensing regulation must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). Adequate standards are those that "channel[ ] the [decision maker's] discretion, forcing it to focus on concrete topics that generate palpable effects on the surrounding neighborhood." *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 639 (4th Cir. 1999). Effective judicial review is not synonymous with certain and prompt consideration of the merits of a licensing denial, at least where—as here—we deal not with time-sensitive forms of speech. *Id.* at 641. Indeed, in *Steakhouse* we held that a licensing scheme provided effective judicial review even though such review was contingent on a court's grant of certiorari, which raised the specter of the court's either refusing to grant certiorari and not hearing the case or granting the writ but delaying to decide the case. *Id.* at 641–42.

The Comprehensive Sign Plan Provision "contain[s] adequate standards to guide the official's decision and render it subject to effective judicial review," *Thomas*, 534 U.S. at 323, and we therefore affirm its constitutionality. Under the Provision's terms, the Arlington Board may grant an exemption

from otherwise-applicable restrictions if it finds that the proposed use will not "(1) affect adversely the health or safety of persons residing or working in the neighborhood of the proposed use; (2) be detrimental to the public welfare or injurious to property or improvements in the neighborhood; [or] (3) be in conflict with the purposes of the master plans of the County." Arlington County, Va., Zoning Ordinance § 36(G)(1). Like the ordinance upheld in *Steakhouse*, the Comprehensive Sign Plan Provision "force[s] [the County Board] to focus on concrete topics that generate palpable effects on the surrounding neighborhood," 166 F.3d at 639. Although the provision speaks of the normally amorphous concept of "public welfare," we find that its placement alongside the phrase "injurious to property or improvements in the neighborhood" militates against an expansive reading of the provision, confined as it is to concerns about land and infrastructure.

Wag More Dogs nevertheless maintains that, no matter the adequacy of the factors listed in the Comprehensive Sign Plan Provision, the regulation confers unfettered discretion on officials because it provides merely that a permit "may" be granted when the requisite standards are satisfied. This use of discretionary language, according to Wag More Dogs, vitiates the standards that follow and compels invalidating the provision. The Supreme Court has expressly foreclosed resort to this argument, however. Although a showing of arbitrariness in granting waivers would pose constitutional difficulty, the Court reasoned "that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Thomas*, 534 U.S. at 325. Wag More Dogs has not alleged such "a pattern of unlawful favoritism," *id.*, so its challenge to the use of discretionary language must fail.

The Comprehensive Sign Plan Provision also satisfies the second prong of the *Thomas* formulation, as it "render[s] [decisions] subject to effective judicial review," *id.* at 323.

Virginia law provides for judicial review of "[e]very action contesting a decision of the local governing body . . . granting or failing to grant a special exception." Va. Code Ann. § 15.2-2285(F). Wag More Dogs argues that the statutory review process is insufficient because Arlington could elect to take no action on an exception request, thereby frustrating the possibility of an applicant's securing meaningful review. We decline to join Wag More Dogs' foray into the world of hypotheticals. *See Thomas*, 534 U.S. at 325 (refusing to consider speculation about potential for abuse of discretion until "a pattern of unlawful favoritism appears"). Moreover, an applicant in the situation Wag More Dogs conjures could nevertheless seek judicial review. The Virginia statute allows for judicial review of decisions "granting or *failing to grant* a special exception." Va. Code Ann. § 15.2-2285(F) (emphasis added). Thus an applicant whose request is indefinitely tabled might receive a judicial hearing on the matter, as such delay could be considered a "fail[ure] to grant" an exception. *See Steakhouse*, 166 F.3d at 642 ("The respect that comity requires we accord state courts invokes a presumption that the superior court would provide [plaintiff] expeditious review.").[6]

V.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

---

[6]Because we agree with the district court that Wag More Dogs has failed to state a claim, we also affirm the court's denial of Wag More Dogs' request for a preliminary injunction.