**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

## No. 13-1996

CENTRAL RADIO COMPANY INC; ROBERT WILSON; KELLY DICKINSON,

                    Plaintiffs - Appellants,

         v.

CITY OF NORFOLK, VIRGINIA,

                    Defendant - Appellee.

## No. 13-1997

CENTRAL RADIO COMPANY INC; ROBERT WILSON; KELLY DICKINSON,

                    Plaintiffs - Appellees,

         v.

CITY OF NORFOLK, VIRGINIA,

                    Defendant - Appellant.

Appeals from the United States District Court for the Eastern
District of Virginia, at Norfolk.   Arenda L. Wright Allen,
District Judge. (2:12-cv-00247-AWA-DEM)

Argued: September 17, 2014        Decided: January 13, 2015

Before GREGORY, AGEE, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Keenan wrote the majority opinion, in which Judge Agee joined. Judge Gregory wrote a separate dissenting opinion.

---

**ARGUED:** Michael Eugene Bindas, INSTITUTE FOR JUSTICE, Bellevue, Washington, for Appellants/Cross-Appellees. Adam Daniel Melita, CITY ATTORNEY'S OFFICE, Norfolk, Virginia, for Appellee/Cross-Appellant. **ON BRIEF:** Robert P. Frommer, Erica Smith, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellants/Cross-Appellees. Melvin W. Ringer, CITY ATTORNEY'S OFFICE, Norfolk, Virginia, for Appellee/Cross-Appellant.

---

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we consider whether the district court erred in granting summary judgment to the City of Norfolk on claims that the City's sign ordinance violated the plaintiffs' rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The plaintiffs, a radio manufacturing and repair business and two of its managers, asserted that the sign ordinance unconstitutionally exempted certain displays from regulation, effectuated a prior restraint on speech, and was selectively enforced in a discriminatory manner by zoning officials. Upon our review, we agree with the district court that the sign ordinance is a content-neutral restriction on speech that satisfies intermediate scrutiny, and we find no merit in the plaintiffs' other constitutional challenges. Therefore, we affirm the district court's judgment.

I.

A.

The City of Norfolk (the City) adopted a zoning ordinance that includes a chapter governing the placement and display of signs (the sign code). See Norfolk, Va., Code app. A § 16 (2012). The City enacted the sign code for several reasons, including to "enhance and protect the physical appearance of all areas of the city," and to "reduce the distractions,

obstructions and hazards to pedestrian and auto traffic caused by the excessive number, size or height, inappropriate types of illumination, indiscriminate placement or unsafe construction of signs." Id. § 16-1.

The sign code applies to "any sign within the city which is visible from any street, sidewalk or public or private common open space." Id. § 16-2. However, as defined in the ordinance, a "sign" does not include any "flag or emblem of any nation, organization of nations, state, city, or any religious organization," or any "works of art which in no way identify or specifically relate to a product or service." Id. § 2-3. Such exempted displays are not subject to regulation under the sign code.

With respect to signs that are eligible for regulation, the sign code generally requires that individuals apply for a "sign certificate" verifying compliance with the sign code. Id. §§ 16-5.1, 16-5.3. Upon the filing of such an application, the City is required to issue a "sign certificate" if the proposed sign complies with the provisions that apply in the zoning district where the sign will be located. Id. §§ 16-5.4, 16-8.

In the "I-1" industrial zoning district in which plaintiff Central Radio Company Inc.'s (Central Radio) property is located, the ordinance provisions include restrictions on the size of signs. Id. § 16-8.3. The size restrictions vary

4

depending on whether a sign is categorized as a "temporary sign," which may be as large as 60 square feet, a "freestanding sign," which may be as large as 75 square feet, or an "other than freestanding sign," which may be as many square feet as the number of linear feet of building frontage facing a public street.[1] Id. The City does not patrol its zoning districts for violations of size restrictions or other provisions of the sign code, but does inspect displays in response to complaints made by members of the public.

B.

The plaintiffs' challenges to the City's sign code relate to a protest of certain adverse action taken against Central Radio by the Norfolk Redevelopment and Housing Authority (NRHA). The NRHA is a chartered political subdivision of Virginia, and consists of an independent committee of seven members appointed by the Norfolk City Council. See Va. Code Ann. § 36-4.

---

[1] Under the sign code, a "temporary sign" is "[a] sign or advertising display constructed of cloth, canvas, fabric, paper, plywood or other light material designed to be displayed and removed within [specified] time periods." Norfolk, Va., Code app. A § 16-3 (2012). A "freestanding sign" is "[a]ny sign placed upon or supported by the ground independently of any other structure." Id. An "other than freestanding sign," or "wall sign," as it is colloquially described by the parties and by the district court, is "[a] sign fastened to the wall of a building or structure in such a manner that the wall becomes the supporting structure for, or forms the background surface of, the sign or a sign painted directly on the wall of the structure." Id.

In April 2010, the NRHA initiated condemnation proceedings against Central Radio and several other landowners, allegedly intending to take and transfer the various properties to Old Dominion University (ODU). Central Radio and the other landowners successfully opposed the taking in state court. Although a trial court initially ruled in favor of the NRHA, that ruling was reversed on appeal by the Supreme Court of Virginia. PKO Ventures, LLC v. Norfolk Redevelopment & Hous. Auth., 747 S.E.2d 826, 829-30 (Va. 2013) (holding that the NRHA lacked the statutory authority to acquire non-blighted property by eminent domain). Accordingly, the condemnation proceeding against Central Radio was dismissed. Norfolk Redevelopment & Hous. Auth. v. Central Radio Co., No. CL102965, 2014 WL 3672087 (Va. Cir. Ct. Apr. 15, 2014).

In March 2012, while the appeal was pending in state court, Central Radio's managers placed a 375-square-foot banner (the banner) on the side of Central Radio's building facing Hampton Boulevard, a major, six-lane state highway. The banner depicted an American flag, Central Radio's logo, a red circle with a slash across the words "Eminent Domain Abuse," and the following message in rows of capital letters: "50 YEARS ON THIS STREET / 78 YEARS IN NORFOLK / 100 WORKERS / THREATENED BY / EMINENT

6

DOMAIN!"[2]    The plaintiffs intended that the banner "be visible for several blocks along Hampton Boulevard" and "make a statement about Central Radio's fight with the NRHA," which would constitute "a shout" rather than "a whisper."

An employee of ODU complained about the banner to a City official, who notified the City's zoning enforcement staff. After investigating the matter, a zoning official informed Central Radio's managers that the banner violated the applicable size restrictions set forth in the sign code. At a later inspection, zoning officials noted that the plaintiffs had failed to bring the display into compliance with the sign code, and ultimately issued Central Radio citations for displaying an oversized sign and for failing to obtain a sign certificate before installing the sign.[3]

---

[2] The Appendix to this Opinion contains an image of the plaintiffs' display.

[3] At the time of the first visit, a City zoning official stated that Central Radio's banner could not exceed 40 square feet, because the building wall facing Hampton Boulevard was 40 feet long. This calculation appeared to treat Central Radio's banner as an "other than freestanding sign" or "wall sign" under the size restrictions of the sign code. See Norfolk, Va., Code app. A § 16-8.3(c) (2012). However, when City zoning officials returned to the Central Radio site less than a week later, they stated that Central Radio's banner could not exceed 60 square feet, a determination apparently based on the restrictions governing "temporary signs." See id. § 16-8.3(a). Ultimately, the written citation issued by the City required Central Radio to reduce the size of its banner to 60 square feet or less.

7

In May 2012, the plaintiffs initiated a civil action to enjoin the City from enforcing its sign code. The plaintiffs alleged that the sign code was unconstitutional because it subjected their display to size and location restrictions, but exempted certain "flag[s] or emblem[s]" and "works of art" from any similar limitations. The plaintiffs also alleged that the sign code's provision requiring them to obtain a sign certificate before erecting a display effectuated an impermissible prior restraint on speech, and that the City selectively applied the sign code to the plaintiffs' display in a discriminatory manner. In addition to requesting declaratory relief and nominal damages, the plaintiffs moved for a temporary restraining order and a preliminary injunction.

The district court denied the plaintiffs' motions and, after discovery was completed, granted summary judgment in favor of the City. The court concluded that the provisions in the sign code exempting flags, emblems, and works of art were content-neutral. Applying intermediate scrutiny, the court held that the sign code was a constitutional exercise of the City's regulatory authority. The court held that those exemptions were reasonably related to the City's interests in promoting traffic safety and aesthetics, because such exempted displays "are less likely to distract drivers than signs" and "are commonly designed to be aesthetically pleasing." In reaching this

8

conclusion, the court also rejected the plaintiffs' prior restraint and selective enforcement claims. After the court entered final judgment, the plaintiffs filed this appeal.[4]

## II.

The core component of the plaintiffs' challenge to the sign code is their argument that the sign code constitutes a content-based restriction on speech, both facially and as applied, that cannot survive strict scrutiny. We disagree with this argument, and address each component of the plaintiffs' constitutional challenges in turn.

## A.

## 1.

In evaluating the content neutrality of a municipal sign ordinance, our "principal inquiry" is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Hill v. Colorado, 530 U.S. 703, 719

---

[4] We disagree with the City's contention that the district court abused its discretion in extending the deadline for filing the appeal after finding that any neglect by plaintiffs' counsel was excusable. Cf. Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 532 n.2 (4th Cir. 1996) (observing that the decision to grant an enlargement of time upon a showing of excusable neglect "remains committed to the discretion of the district court"). The district court did not exceed its discretion in excusing a brief delay that did not prejudice the defendant or result from any bad faith on the plaintiffs' part. See, e.g., Salts v. Epps, 676 F.3d 468, 474-75 (5th Cir. 2012).

(2000) (citation omitted); see Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("The government's purpose is the controlling consideration."). We have described this inquiry as being "practical" in nature, and have noted that the Supreme Court has rejected any "formalistic approach to evaluating content neutrality that looks only to the terms of a regulation." Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 366 (4th Cir. 2012). Under our precedent,

> [a] regulation is not a content-based regulation of speech if (1) the regulation is not a regulation of speech, but rather a regulation of the places where some speech may occur; (2) the regulation was not adopted because of disagreement with the message the speech conveys; or (3) the government's interests in the regulation are unrelated to the content of the affected speech.

Brown v. Town of Cary, 706 F.3d 294, 302 (4th Cir. 2013) (quoting Wag More Dogs, 680 F.3d at 366).

We therefore have observed that "[a] statute's differentiation between types of speech does not inexorably portend its classification as a content-based restriction." Wag More Dogs, 680 F.3d at 366-67; see also id. at 368 ("That [municipal] officials must superficially evaluate a sign's content to determine the extent of applicable restrictions is not an augur of constitutional doom."). Instead, "a distinction is only content-based if it distinguishes content 'with a

10

censorial intent to value some forms of speech over others to distort public debate, to restrict expression because of its message, its ideas, its subject matter, or to prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.'" Clatterbuck v. City of Charlottesville, 708 F.3d 549, 556 (4th Cir. 2013) (quoting Brown, 706 F.3d at 301-02); see Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 434 (4th Cir. 2007) (noting that a sign ordinance may "require[] looking generally at what type of message a sign carries to determine where it can be located," so long as the municipality does not undertake a "more searching inquiry into the content" that would "regulate the location of different types of signs based on the ideas or views expressed") (citation and internal quotation marks omitted). We discern censorial intent by examining whether there is a relationship between an ordinance's legislative purpose and the content distinctions addressed in the ordinance, Brown, 706 F.3d at 303, and by deciding "whether the government's content-neutral justification reasonably comports with the content distinction on the face of the regulation." Clatterbuck, 708 F.3d at 556.

In Brown v. Town of Cary, we reviewed a challenge to a sign ordinance that generally subjected residential signs to certain quantity and size restrictions, but exempted from regulation

11

"holiday decorations" erected in honor of governmental or religious holidays and "public art" intended to beautify public areas. 706 F.3d at 298. We held that the municipality demonstrated a "reasonable relationship" between its exemptions and its legitimate interests in traffic safety and aesthetics, concluding that it was "reasonable to presume that public art and holiday decorations enhance rather than harm aesthetic appeal, and that seasonal holiday displays have a temporary, and therefore less significant, impact on traffic safety." Id. at 304. Although we acknowledged that the exempted displays "may implicate traffic safety no less than an ordinary residential sign," and may even "impair rather than promote aesthetic appeal," we clarified that "the content neutrality inquiry is whether [a particular ordinance's] exemptions have a reasonable, not optimal, relationship to these asserted interests." Id. We also noted that empirical judgments regarding "the precise restriction necessary" to carry out legitimate legislative interests are best left to legislative bodies. Id. (quoting Randall v. Sorrell, 548 U.S. 230, 248 (2006) (plurality opinion)).

The content distinctions that we upheld in Brown resemble those at issue in the present case. The plaintiffs, however, attempt to distinguish the present sign code exemptions by arguing that they facially are unrelated to legislative

12

interests in aesthetics or traffic safety, whereas the exemptions in Brown expressly involved decorations that were "not intended to be permanent in nature" and art that was "intended to beautify or provide aesthetic influences to public areas." 706 F.3d at 298.

The plaintiffs further characterize the City's sign code exemptions as being too narrow, in that they exempt the flags and emblems only of governmental or religious organizations, and being too broad, in that they exempt all works of art but do not specifically define "art." The plaintiffs argue that because private or secular flags may have the same effect on aesthetics and traffic safety as exempted displays, and because certain works of art may have a more detrimental effect with regard to those purposes than displays subject to regulation, the exemptions lack a reasonable relationship to any legitimate interests and thus are content-based restrictions on speech.

The plaintiffs' analysis fails, however, because in determining the level of scrutiny, we are not concerned with the "precise" or "optimal" tailoring of exemptions to a sign ordinance, but the extent to which they bear a "reasonable" relationship to legitimate legislative purposes. Id. at 304. Indeed, in Brown, we agreed that similar exemptions "may impair" legislative interests, but concluded that the sign ordinance was content-neutral because it placed "reasonable time, place, and

13

manner restrictions only on the physical characteristics of messages . . . exempt[ing] certain categories of signs from those restrictions solely on the basis of the [municipality's] asserted and legitimate interests of traffic safety and aesthetics." Id. at 304-05.

We reach a similar conclusion here. The City generally allows signs regardless of the message displayed, and simply restricts the time, place, or manner of their location. Exemptions to those restrictions may have an "incidental effect on some speakers or messages," but such exemptions do not convert the sign code into a content-based restriction on speech when the exemptions bear a "reasonable relationship" to the City's asserted interests. Wag More Dogs, 680 F.3d at 368 (citation omitted); Brown, 706 F.3d at 304.

We conclude that it is reasonable to presume that works of art generally "enhance rather than harm aesthetic appeal," Brown, 706 F.3d at 304, and we find it similarly reasonable to conclude that flags or emblems generally have a less significant impact on traffic safety than other, more distracting displays. These exemptions do not differentiate between content based on "the ideas or views expressed." Covenant Media, 493 F.3d at 434 (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 643 (1994)) (internal quotation marks omitted). By exempting the flags or emblems of governmental or religious organizations from

14

reasonable size restrictions, the City has not indicated any preference for a particular governmental or religious speaker or message, and the sign code exerts only an "incidental effect" on the flags or emblems of other organizations. Wag More Dogs, 680 F.3d at 368. Also, by exempting works of art that are non-commercial in character, the City has not favored certain artistic messages over others. Given the City's "clear content-neutral purpose" and the absence of a more specific inquiry in the sign code regarding the content of the regulated signs, we conclude that the sign code is a content-neutral regulation of speech. See Covenant Media, 493 F.3d at 434.

2.

Because the sign code is content-neutral, we evaluate its constitutionality under intermediate scrutiny. Brown, 706 F.3d at 305. Under this level of deference, a content-neutral regulation is valid if it "furthers a substantial government interest, is narrowly tailored to further that interest, and leaves open ample alternative channels of communication." Id. (quoting Wag More Dogs, 680 F.3d at 369) (internal quotation marks omitted).

Initially, we observe that the sign code was enacted to promote the City's "physical appearance" and to "reduce the distractions, obstructions and hazards to pedestrian and auto traffic." Such concerns for aesthetics and traffic safety

15

undoubtedly are substantial government interests. Id. Moreover, the record contains evidence that Central Radio's banner affected those interests,[5] including testimony that the banner was sufficiently large to be seen from a distance of three city blocks, and that passing motorists reacted to the banner by "honk[ing] their horns," "yell[ing] things in support," and "wav[ing]."[6] See id. (noting that a motorist "beep[ing] his horn" in response to the plaintiff's sign

[5] The plaintiffs state that the City is obligated "to proffer actual, objective evidence to support the sign-code provisions." We recently rejected, at the motion to dismiss stage, this "literally unprecedented" argument, observing that "were we to accept the proposition, dismissal would effectively never be appropriate in the context of a First Amendment challenge, as the inquiry starts and stops with facts alleged in the plaintiff's complaint and gives the government no opportunity to test the plausibility of the claim by producing evidence." Wag More Dogs, 680 F.3d at 365 n.3. But we also noted that the evidentiary burden is limited in that the City "need not reinvent the wheel by coming forward with voluminous evidence justifying a regulation of the type that has been upheld several times over." Id. We reiterate that the burden on the governmental defendant in this context is that "of establishing that the [sign code] passes constitutional muster under the rubric of intermediate scrutiny." Id.

[6] The plaintiffs contend that "[e]xpressions of support are not evidence of distraction; they are evidence of agreement." We fail to see how agreement with a message bears on the issue whether motorists are distracted by a sign while driving. The undisputed fact that passing motorists reacted emphatically to Central Radio's banner, regardless whether they privately or publicly agreed with the banner's message, constitutes evidence that the banner contributed to the "distractions, obstructions and hazards to pedestrian and auto traffic" that the sign code was intended to reduce.

16

constituted evidence of specific traffic problems relating to the display).

Next, we conclude that the sign code is narrowly tailored because it does not "burden substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 U.S. at 799. Instead, the sign code's size and location restrictions demonstrate that the City has "carefully calculated the costs and benefits associated with the burden on speech . . . ." City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 (1993) (internal quotation marks omitted). Because such restrictions "do no more than eliminate the exact source of the evil [the ordinance] sought to remedy," we are satisfied that the sign code is sufficiently well-tailored to withstand constitutional scrutiny. Brown, 706 F.3d at 305 (citation and internal quotation marks omitted).

Finally, unlike an outright ban on speech, the sign code "leaves open ample alternative channels of communication" by generally permitting the display of signs "subject only to size and location restrictions." Wag More Dogs, 680 F.3d at 369 (citation and internal quotation marks omitted). Although the plaintiffs argue that there are no reasonable alternatives for conveying the same message in a way that can be seen from Hampton Boulevard by "the thousands of people who pass by Central Radio's property every day," the plaintiffs do not have

17

a constitutional right to place their sign in the location and manner that they deem most desirable. See Ross v. Early, 746 F.3d 546, 559 (4th Cir. 2014) (observing that "[t]he First Amendment affords no special protection to a speaker's favored or most cost-effective mode of communication") (citation and internal quotation marks omitted). Accordingly, our inquiry "does not rise or fall on the efficacy of a single medium of expression." Id.

It is undisputed here that the plaintiffs' 375-square-foot banner would comport with the City's sign code if the banner were reduced to a size of 60 square feet. We recently have deemed such an alternative to be adequate upon comparable facts. See Wag More Dogs, 680 F.3d at 369 (reasoning that a sign ordinance left open ample alternative channels of communication because the plaintiff was allowed to display a 60-square-foot version of a 960-square-foot painting). Accordingly, because the City's content-neutral sign code satisfies intermediate scrutiny both facially and as applied to the plaintiffs' display, we agree with the district court's holding that the sign code satisfies the constitutional requirements of the First Amendment.

B.

The plaintiffs additionally argue that the City selectively enforced its sign code in violation of the First Amendment and

18

the Equal Protection Clause of the Fourteenth Amendment when the City issued the citations to the plaintiffs but allowed analogous displays to stand. A selective enforcement claim of this nature requires a plaintiff to demonstrate that the government's enforcement process "had a discriminatory effect and that it was motivated by a discriminatory purpose." Wayte v. United States, 470 U.S. 598, 608 (1985). Thus, a plaintiff must show not only that similarly situated individuals were treated differently, but that there was "clear and intentional discrimination." Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 825 (4th Cir. 1995) (citing Washington v. Davis, 426 U.S. 229, 239 (1976)).

Even assuming, without deciding, that the City's past refusal to enforce strictly the sign code constituted evidence of discriminatory effect,[7] dismissal of the plaintiffs' selective enforcement claim was proper because there was insufficient evidence that the City was motivated by a discriminatory intent. We have recognized several factors as probative in determining discriminatory intent, including:

---

[7] On appeal, the City appears to have conceded that it declined to enforce its sign code against the oversized electronic message board of a local museum, but maintains that "Central Radio failed to show that the decision to forego enforcement was motivated by a desire to favor some particular message."

19

(1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

Sylvia Dev., 48 F.3d at 819 (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266-68 (1977)).

None of these factors weighs in the plaintiffs' favor. Although the plaintiffs attempt to impugn the City's motives in enforcing its sign code against their banner protesting the use of eminent domain by the NRHA, the record is devoid of evidence that the City attempted to reduce the size of Central Radio's sign because the City disagreed with Central Radio's message or sought to suppress a message that was critical of the NRHA, an independent entity. Also absent from the record is any indication of "significant departures from normal procedures" by City zoning officials, id., who received a complaint about a sign, conducted an investigation, consulted with one another, and issued Central Radio a verbal warning followed by written citations.

We agree with the district court that the City's past failure to enforce its sign code strictly, and the City's more

20

zealous efforts to do so since the commencement of this litigation, are not sufficient to substantiate the "invidiously discriminatory intent" that is required of a selective enforcement claim. Sylvia Dev., 48 F.3d at 819 (citations and internal quotation marks omitted). Instead, the plaintiffs must show "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. at 819 n.2 (citation and internal quotation marks omitted). Such evidence is wholly lacking in this case. Accordingly, we affirm the district court's award of summary judgment on the plaintiffs' selective enforcement claim.

## C.

Finally, the plaintiffs argue that the sign code is an unconstitutional prior restraint on speech because it required them to obtain a sign certificate evidencing compliance with the sign code, but failed to impose time limits or adequate standards on the City's decisionmaking process. We disagree.

The Supreme Court requires procedural safeguards for certain speech licensing schemes, which protections include time limitations on the decisionmaking process. See Freedman v. Maryland, 380 U.S. 51, 58-60 (1965); 11126 Balt. Blvd., Inc. v. Prince George's Cnty., Md., 58 F.3d 988, 997 (4th Cir. 1995) (en banc). Those safeguards, however, apply only to content-based

21

"subject-matter censorship," not to "content-neutral time, place, and manner regulation." Thomas v. Chi. Park Dist., 534 U.S. 316, 322 (2002).

Because we have held that the City's sign code was content-neutral, we further conclude that the sign code was not required to impose a constitutional protection of time limits on the decisions of zoning officials. See Covenant Media, 493 F.3d at 435. However, this conclusion does not necessarily end the inquiry, because a decisionmaker cannot use the absence of such requirements to stifle an individual's First Amendment rights. Id. (citing Thomas, 534 U.S. at 323).

Here, the plaintiffs do not allege that the City is responsible for any undue delay in enforcing the sign code. In fact, it appears that City zoning officials informed Central Radio's managers that their sign failed to comply with the sign code immediately upon inspecting Central Radio's property, and issued written citations less than a week later when the officials observed that the sign had not been modified or removed despite the warning.

The plaintiffs argue, nevertheless, that the City's sign code confers too much discretion on the zoning officials who process applications for sign certificates. Under the Supreme Court's decision in Thomas, "a content-neutral licensing regulation must 'contain adequate standards to guide the

22

official's decision and render it subject to effective judicial review.'" Wag More Dogs, 680 F.3d at 372 (quoting Thomas, 534 U.S. at 323). "Adequate standards are those that channel the decision maker's discretion, forcing it to focus on concrete topics that generate palpable effects on the surrounding neighborhood." Id. (citation, brackets, and internal quotation marks omitted).

Although the plaintiffs acknowledge that the City's sign code does not provide officials any discretion to deny a sign certificate when the requisite standards are satisfied, the plaintiffs argue that the standards governing size restrictions and exemptions for "works of art" are so vague and indeterminate that they do not provide any guide for official decisions. We disagree with this argument.

The sign code clearly defines the circumstances in which size restrictions apply based on a sign's classification as a "temporary sign," "freestanding sign," or "other than freestanding sign," see Norfolk, Va., Code app. A §§ 16-3, 16-8.3 (2012), and limits the "works of art" exemption to displays "which in no way identify or specifically relate to a product or service," id. § 2-3. Although arbitrariness in applying restrictions or exemptions "would pose constitutional difficulty," any such abuse must be addressed "if and when a pattern of unlawful favoritism appears, rather than by insisting

23

upon a degree of rigidity that is found in few legal arrangements." Wag More Dogs, 680 F.3d at 373 (quoting Thomas, 534 U.S. at 325) (internal quotation marks omitted).

The plaintiffs have failed to show any such "pattern of unlawful favoritism." Id. Nor have the plaintiffs argued that the sign code fails to satisfy Thomas's requirement that an ordinance provide for decisions "subject to effective judicial review," 534 U.S. at 323, perhaps because the plaintiffs had a statutory right to appeal their citations to the board of zoning appeals, Va. Code Ann. § 15.2-2311, and to file a petition for judicial review of any final decision by that body, id. § 15.2-2314. Cf. Wag More Dogs, 680 F.3d at 373 (noting that the existence of an adequate statutory review process for certain zoning decisions satisfied the second prong of the Thomas formulation). Accordingly, because the City's sign code satisfies the standards required of content-neutral licensing regulations, we conclude that the district court did not err in rejecting the plaintiffs' challenge to the sign code as an unconstitutional prior restraint on speech.

III.

For these reasons, we affirm the district court's judgment.

AFFIRMED

24

GREGORY, Circuit Judge, dissenting:

Central Radio challenges the City of Norfolk's restrictions on its sign protesting the seizure of its land by eminent domain – a protest that the Virginia Supreme Court ultimately vindicated. See PKO Ventures, LLC v. Norfolk Redev. & Hous. Auth., 747 S.E.2d 826, 833 (Va. 2013). I write separately to dissent from Part II.A.1 of the majority opinion, as I do not believe our precedent compels application of a content-neutral inquiry.

I would apply a content-based test to the City's Sign Code. As the majority opinion recognizes, this Court's so-called practical inquiry is meant to determine if the government's regulation is "justified without reference to the content of regulated speech." Brown v. Town of Cary, 706 F.3d 294, 303 (4th Cir. 2013) (quoting Hill v. Colorado, 530 U.S. 703, 720 (2000)). As we stated in Brown, the lack of any relationship between a law's content distinction and its legislative end is probative of whether the government has discriminated on the basis of content. See 706 F.3d at 303 (citing Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 513-14 (1981) (plurality)). In a case like this, involving political speech against the heaviest hand of government attempting to seize its citizen's land, we must ensure a "reasonable fit" between the City's asserted interests in aesthetics and traffic safety, and the

25

Code's exemptions for government and religious emblems and flags. Id.

I disagree that the City has demonstrated this "reasonable fit." Why is it that the symbols and text of a government flag do not affect aesthetics or traffic safety and escape regulation, whereas a picture of a flag does negatively affect these interests and must be subjected to size and location restrictions? I see no reason in such a distinction. This is a much different case from the exemptions we confronted in Brown for temporary holiday decorations and public art. See 706 F.3d at 304-05. There, we thought it "reasonable to presume" that decorations and art enhance aesthetic appeal, and that the seasonal nature of holiday displays had a "temporary, and therefore less significant, impact on traffic safety." Id. at 304. Unlike in our case, the exemptions in Brown could be justified on the basis of aesthetics and safety concerns. I find no such justification here, where the City's regulatory scheme perpetually disadvantages dissidents like Central Radio. The danger is not that the City has "indicated any preference for a particular governmental or religious speaker or message," Maj. Op. at 15, but that it declines to regulate entirely and therefore favors all official government and religious speakers and speech. For this reason, the exemptions should be forced to withstand heightened scrutiny under a content-based test.

26

Furthermore, the City has not adequately demonstrated that its adoption of the Code and its exemptions was unrelated to disagreement with a particular message. See Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 368 (4th Cir. 2012) ("[D]isagreement with the message [speech] conveys . . . is the principal inquiry in determining content neutrality.") (internal quotation marks and citation omitted). Although the City maintains this is the case, it references only the Purpose Statement within the Code as support. In Brown, we warned that "the mere assertion of a content-neutral purpose" is not "enough to save a law which, on its face, discriminates based on content." 706 F.3d at 304 (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642-43 (1994)); see also id. ("[W]hen a government supplies a content-neutral justification for the regulation, that justification is not given controlling weight without further inquiry.") (quoting Whitton v. City of Gladstone, 54 F.3d 1400, 1406 (8th Cir. 1995)). Even if a party need not "com[e] forward with voluminous evidence justifying a regulation," Wag More Dogs, 680 F.3d at 365 n.3, surely it must do something more than simply point to a content-neutral justification written into the law's preface. At least in Brown, the city "adequately documented" that its legislative interests were unrelated to the ordinance's content distinctions through legislative findings, policy

27

statements, and testimony of Town officials.  <u>Brown</u>, 706 F.3d at 305.  I find no such showing in this record.[*]

This case implicates some of the most important values at the heart of our democracy:  political speech challenging the government's seizure of private property – exactly the kind of taking that our Fifth Amendment protects against.  If a citizen cannot speak out against the king taking her land, I fear we abandon a core protection of our Constitution's First Amendment.  Here, Central Radio spoke out against the king and won.  It may be that the Code passes the heightened scrutiny of a content-based inquiry.  But to stop short without subjecting the regulation to a more rigorous examination does a disservice to our cherished constitutional right to freedom of speech.  I respectfully dissent.

---

[*] In fact, one of the drafters of the Code revealed in his deposition:  "Why do we create exemptions for government flags, is that what you're asking?  Because I believe we believe that's the right thing to do . . .  I think we consider the importance of an American flag or a state flag to far exceed that of an enthusiastic sports flag."  J.A. 1012-13.

28

